******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CLARENCE
MALCOLM PATTERSON
(AC 37982)

Lavine, Alvord and Harper, Js.

*Argued November 28, 2016—officially released February 21, 2017*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, geographical area number one,
Colin, J.)

*Heather Clark*, assigned counsel, for the appellant
(defendant).

*Mitchell S. Brody*, senior assistant state's attorney,
with whom, on the brief, were *Richard J. Colangelo, Jr.*,
state's attorney, and *Jonathan Lewin*, deputy assistant
state's attorney, for the appellee (state).

*Opinion*

LAVINE J. The defendant, Clarence Malcolm Patterson, appeals from the judgment of conviction, rendered after a jury trial, of one count of burglary in the second degree in violation of General Statutes § 53a-102 and one count of attempted larceny in the fifth degree in violation of General Statutes §§ 53a-49 and 53a-125a. On appeal, the defendant claims that (1) the trial court erroneously denied his motion to suppress two photographic lineup identifications and one private actor identification, (2) the state improperly cross-examined his expert witness when it questioned him about the opinions of other experts and about a hypothetical question that included facts not in evidence, and (3) the prosecutor engaged in multiple acts of prosecutorial impropriety. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately noon on May 2, 2013, Lester Segura was in his bedroom with his girlfriend, Angie Espitia, when he heard someone enter his residence. Segura hid behind his bedroom door and peered around it to see the defendant standing in his residence. From his room, Segura asked the defendant why he was there and asked him several times to leave. The defendant responded that he knocked on the front door and noticed that it was open, so he "just came in." During this exchange, Segura looked around the door three times. He observed the defendant for a total of fifteen to twenty seconds but saw the defendant's "full face" for approximately three to four seconds.

When the defendant exited the residence through the front door, Segura went outside and observed the defendant "walking fast" down the street toward a liquor and dress store. Gabriel Duarte, an employee of the store, was sweeping the sidewalk when he observed the defendant exit Segura's residence. Duarte was "face-to-face" with the defendant for approximately five seconds.

Segura went back inside his residence and noticed that his computer, iPad, and tools were on the couch where he had not left them. He then went into his brother's room and saw that somebody had moved his brother's coin jar. Espitia called 911, but before the police arrived, Segura realized that he recognized the defendant from "[i]n the store, [and] out on the street." He also thought that he had seen the defendant previously on the local news. He quickly checked News Channel 12 from his cell phone and found the defendant's photograph, which was displayed in relation to another burglary that took place approximately two weeks prior.

On May 8, 2013, Segura identified the defendant in a double-blind,[1] sequential[2] photographic lineup[3] as the

man he saw in his residence. One and one-half weeks before trial, Duarte identified the defendant in a different double-blind, sequential photographic lineup as the man he saw leaving Segura's residence. Duarte told police that he had seen the defendant prior to May 2, 2013, walking around the neighborhood. He also stated that the defendant previously had shopped at Duarte's store and that Duarte had once purchased a toy bubble gun from the defendant.[4]

The defendant was charged with burglary in the second degree and attempted larceny in the fifth degree. On July 14, 2014, the defendant filed a motion to suppress any identifications of him by Segura and Duarte. On August 18, 2014, the court conducted an evidentiary hearing, and on August 19, 2014, the court denied the defendant's motion.

During the defendant's case-in-chief, he called Samuel R. Sommers, an associate professor at Tufts University, to testify about the unreliability of eyewitness identifications. The state cross-examined Sommers about other experts' opinions pertaining to the reliability of these studies. The state also posed a hypothetical question to Sommers. Defense counsel did not object to either line of questioning.

During his closing and rebuttal arguments, the prosecutor stated that Sommers' testimony actually supported the state's theory that Segura and Duarte made accurate identifications of the defendant, reiterating the hypothetical he posed to Sommers. In addition, without tying his assertion to any evidence admitted at trial, the prosecutor opined that the defendant planned on selling Segura's property to a pawn shop.

On August 22, 2014, the jury found the defendant guilty on both counts. The court sentenced the defendant to ten years incarceration for the burglary in the second degree conviction and six months for the attempted larceny in the fifth degree conviction, for a total effective sentence of ten and one-half years. This appeal followed. Additional facts will be set forth as necessary.

## I

### IDENTIFICATIONS

The defendant's first claim is that the court erroneously denied the defendant's motion to suppress the identifications of him by Segura and Duarte. Specifically, the defendant claims that the photographs viewed by Segura and Duarte were unduly suggestive and that the process[5] by which police showed Duarte the photographs was unduly suggestive.[6] The defendant also claims that Segura's private actor identification, when he identified the defendant from the news article, was the product of Segura's unduly suggestive conduct.[7] The state claims that the police actions were not unduly suggestive because the police conducted double-blind,

sequential lineups, and the photographs were not unduly suggestive because the defendant's photograph "was not highlighted in comparison to the other photographs." The state also claims that "Segura's use of his cell phone to access an online . . . picture did not constitute an unnecessarily suggestive method of identification." We agree with the state and conclude that no part of the identification was the product of unnecessarily suggestive conduct and, therefore, do not reach the question of whether the identifications were otherwise unreliable.

The following additional facts, which are either in the record or which the court found in ruling on the motion to suppress, are relevant to this claim. During the 911 phone call made by Espitia, Segura described the defendant as a "bald [and] black" man. Shortly after, Daniel Musso, an officer of the Stamford Police Department (department), responded to the 911 call made by Espitia. When he arrived at Segura's residence, Segura described the defendant as a "black bald man" between the ages of forty and fifty years old. He also told Musso that he had seen the defendant prior to the incident and showed Musso the photograph of the defendant he found from the news. Musso did not ask Segura to locate the photograph and did not see the photograph until after he started his investigation.

Peter Dispagna, a sergeant with the department, created two different photographic lineups, both of which included a photograph of the defendant.[8] In the photographic lineup shown to Segura, the defendant was the oldest person depicted in the photographs.[9] The defendant's height fell within the range of the other individuals' heights, and the defendant and three other individuals were bald while the rest of the individuals had hair of varying lengths.[10] The seven other individuals wore black and white shirts while the defendant wore an orange shirt. In the photographic lineup shown to Duarte, the defendant was not the oldest person depicted but was the only person who was bald.[11]

On May 8, 2013, William Moore, an investigator with the department, conducted a double-blind, sequential photographic lineup with Segura. He read Segura the instructions on the witness instruction sheet before he conducted the photographic lineup, which included instructions that "[t]he perpetrator may or may not be among the persons in the photographic line up," and "[t]he persons in the photographic lineup . . . may not look exactly as they did on the date of the offense because features like facial or head hair can change." Segura looked at all of the photographs as Moore turned them over one by one, and he immediately identified the defendant.

Approximately one and one-half weeks before the trial, Damien Rosa, an officer with the department, conducted a double-blind, sequential photographic lineup

with Duarte. Rosa read the same instructions to Duarte as were read to Segura in English and in Spanish. After observing all of the photographs, Duarte immediately identified the defendant. Dispagna remained in the room while Rosa conducted the photographic lineup but did not assist Rosa in conducting the lineup or "say a word throughout the entire process."

Prior to trial, the defendant filed a motion to suppress any identifications of him by Segura and Duarte, including the photographic lineup identifications and Segura's private actor identification of the defendant from the news article. On August 18, 2014, the court held an evidentiary hearing on the motion to suppress, in which a number of witnesses, including Musso and Duarte, testified. On August 19, 2014, the court rendered an oral decision, denying the defendant's motion to suppress. It found that neither the photographs themselves nor the procedures used by police to obtain the identifications were "unnecessarily suggestive."[12] It also found Segura's "conduct [not] to be unnecessarily suggestive."[13]

A

Photographic Lineup Identifications

The defendant claims on appeal that the court erroneously denied his motion to suppress the photographic lineup identifications by Segura and Duarte. With regard to Segura's photograph lineup identification, the defendant argues that the photographs in the lineup were unnecessarily suggestive because only one individual in the photographs "was close in age to the defendant." In addition, "[m]any of the individuals in the photographs . . . were significantly shorter than the defendant and had hair," and "the defendant was the only individual wearing a colored shirt." With regard to Duarte's identification, the defendant argues that the photographs used in the procedure were unnecessarily suggestive because of the "lack of likeness shared by the individuals pictured and the prominence of the defendant's photograph." He also argues that the conduct of police was unnecessarily suggestive because Dispagna, who was "someone who knew the defendant," was present during the procedure. We disagree.

"Upon review of a trial court's denial of a motion to suppress, [t]he court's conclusions will not be disturbed unless they are legally and logically inconsistent with the facts. . . . Because the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) *State* v. *Elliston*, 86 Conn. App. 479, 482–83, 861 A.2d 563 (2004), cert. denied, 273 Conn. 906, 868 A.2d 746 (2005).

"[T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . . Therefore, [t]he critical question . . . is what makes a particular identification procedure suggestive enough to require the court to proceed to the second prong and to consider the overall reliability of the identification. . . . In deciding [the first prong] . . . the entire procedure, viewed in light of the factual circumstances of the individual case . . . must be examined to determine if a particular identification is tainted by unnecessary suggestiveness." (Citation omitted; internal quotation marks omitted.) *State* v. *Grant*, 154 Conn. App. 293, 303, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015). An "analysis of unnecessary suggestiveness must be conducted in light of the totality of the circumstances . . . ." (Internal quotation marks omitted.) *State* v. *Manson*, 118 Conn. App. 538, 545, 984 A.2d 1099 (2009), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010).

With regard to the first prong, "the court should focus on two factors. The first factor concerns the composition of the photographic array itself." (Internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 49, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). "To determine whether a photographic array is unnecessarily suggestive, a reviewing court considers various factors, including, but not limited to: (1) the degree of likeness shared by the individuals pictured . . . (2) the number of photographs included in the array . . . (3) whether the suspect's photograph prominently was displayed or otherwise was highlighted in an impermissible manner . . . (4) whether the eyewitness had been told that the array includes a photograph of a known suspect . . . (5) whether the eyewitness had been presented with multiple arrays in which the photograph of one suspect recurred repeatedly . . . and (6) whether a second eyewitness was present during the presentation of the array." (Internal quotation marks omitted.) *State* v. *Smith*, 107 Conn. App. 666, 673–74, 946 A.2d 319, cert. denied, 288 Conn. 902, 952 A.2d 811 (2008).

"The second factor, which is related to the first but conceptually broader, requires the court to examine the actions of law enforcement personnel to determine whether the witness' attention was directed to a suspect because of police conduct. . . . In considering this [factor, the court should] look to the *effects* of the circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice the defendant. . . . It stands to reason that police officers administering a photographic identification procedure

have the potential to taint the process by drawing the witness' attention to a particular suspect. This could occur either through the construction of the array itself or through physical or verbal cues provided by an officer. . . . The failure of a police officer to provide an affirmative warning to witnesses that the perpetrator may or may not be among the choices in the identification procedure is one circumstance that may increase the likelihood of a mistaken identification." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Outing*, supra, 298 Conn. 49.

We conclude that, under the totality of the circumstances, the compositions of the photographic lineups were not unnecessarily suggestive. After a review of the record, we agree with the court's finding that "there was nothing improper about the degree of likeness shared by the individuals pictured in each photo array." The differences in hair styles between the individuals are slight; for example, there is little variation between being "bald" and a having "flat top" hairstyle. There is nothing in the photographs that indicate that there are height differences between the individuals because the photographs only show the individuals' heads and shoulders, and there are no visible height indicators. The differences in age are not dispositive because the analysis focuses on the "likeness" of the individuals, and most of the individuals look similar in age to the defendant. The only difference that arguably could differentiate the defendant's photograph from the others is that he is the only one wearing a colored shirt. Yet, there is nothing in the record to indicate that the orange shirt influenced Segura's decision in choosing the defendant's photograph. See, e.g., *State* v. *Smith*, supra, 107 Conn. App. 671 (distinction that defendant was only individual wearing a red shirt did not make photographic array unnecessarily suggestive); see also *State* v. *Vaughn*, 199 Conn. 557, 564, 508 A.2d 430 ("[a]ny array composed of different individuals must necessarily contain certain differences"), cert. denied, 479 U.S. 989, 107 S. Ct. 583, 93 L. Ed. 2d 585 (1986). Even though Segura identified the defendant from the news article prior to the photographic lineup, the defendant provided no evidence that either Segura or Duarte knew that the defendant's photograph was included in the photographic array.

We also conclude that the photographic lineup procedures in the present case were not unnecessarily suggestive. The police did nothing to bring Segura's or Duarte's unwarranted attention to the defendant's photograph.[14] The defendant failed to produce any evidence that either Moore or Rosa influenced Segura's or Duarte's selection of the defendant's photograph. In fact, neither Moore nor Rosa were aware of who the target was or whether the defendant was included within the photographic lineup. In addition, the witness instruction sheet was read to both Segura and Duarte,

and the instructions gave an affirmative warning that the suspect's photograph may or may not be part of the photographic lineup. Specifically with regard to Duarte's photographic lineup procedure, Dispagna was not near either Rosa or Duarte during the procedure and did not speak to Duarte until after the completion of the photographic lineup. In short, both photographic lineup procedures were conducted in a nonsuggestive manner.

Accordingly, we conclude that the identifications were not products of unnecessarily suggestive actions on the part of the police.

### B

### Private Actor Identification

The defendant also argues on appeal that the court erroneously denied his motion to suppress the private actor identification by Segura. The defendant asserts that prior to May 2, 2013, "Segura read a news article related to a burglary [and] the defendant's picture was displayed in that article next to a female, but no other males." Not until after Segura observed the defendant in his residence did he "conduct . . . Internet research to relocate that news article" in order to identify the defendant to the police. Thus, the defendant argues that because Segura already had seen the defendant in an incriminating news article prior to the incident, Segura's conduct of *searching* for the defendant's incriminating photograph in order to make an identification was unnecessarily suggestive. We disagree.

"Because the [fourteenth] [a]mendment is directed at the states, it can be violated only by conduct that may be fairly characterized as state action." (Internal quotation marks omitted.) *State* v. *Holliman*, 214 Conn. 38, 43, 570 A.2d 680 (1990). Accordingly, "the [d]ue [p]rocess [c]lause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Perry* v. *New Hampshire*, U.S. , 132 S. Ct. 716, 730, 181 L. Ed. 2d 694 (2012); see also *State* v. *Holliman*, supra, 46–49 (federal constitutional provisions are not implicated when defendant alleges identification product of unnecessarily suggestive private conduct). Our Supreme Court recently has held that no state constitutional provisions are automatically implicated when a defendant makes a claim of unnecessarily suggestive private conduct. See *State* v. *Johnson*, 312 Conn. 687, 704–705, 94 A.3d 1173 (2014). Our Supreme Court, nevertheless, believes that even though a claim of unnecessary private conduct has no constitutional underpinning, "as a matter of *evidentiary* law, the criteria established for determining the admissibility of identifications in the due process context are appropriate guidelines by which to determine the admissibil-

ity of identifications that result from procedures conducted by civilians." (Emphasis in original; internal quotation marks omitted.) Id., 700. Therefore, "while the reliability of an eyewitness identification, or the lack thereof, ordinarily goes to the weight of the evidence, and not its admissibility, unreliable identification evidence that is tainted by unduly suggestive private conduct, like such evidence that is tainted by improper state action, is inadmissible . . . ." (Emphasis omitted; footnote omitted.) Id.

"Accordingly, we will engage in the two-pronged inquiry traditionally applied to identifications involving state action to determine the admissibility at trial of [a private actor] identification. [F]irst, it must be determined whether the identification procedure was unnecessarily suggestive, and second, if it is found to be so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Holliman*, supra, 214 Conn. 46.[15]

We agree with the court's finding that Segura's "conduct" was not "unnecessarily suggestive." The defendant cites to no case law, and we are aware of none, which suggests that searching for an individual's photograph online after observing that individual in person constitutes unnecessarily suggestive conduct.[16]

Accordingly, we conclude that the identification Segura made from the news article was not a product of unnecessarily suggestive conduct, and the trial court did not err in denying the defendant's motion to suppress.

II

CROSS-EXAMINATION OF EXPERT WITNESS

The defendant's second claim is that the state improperly cross-examined Sommers, the defendant's expert witness, about the testimony of another expert in a different trial and about the opinions of other experts. The defendant also claims that the state impermissibly cross-examined Sommers about a hypothetical question that included facts not in evidence. The defendant acknowledges that his claim is unpreserved but contends that reversal is appropriate pursuant to the plain error doctrine.[17] The state claims that both lines of questioning were proper. Because defense counsel did not object to the questions the state asked during cross-examination, the defendant failed to preserve his claim, and we will not review it.

The following additional facts are relevant to this claim. On direct examination, Sommers testified about the different types of scientific and statistical studies that have been conducted to test the reliability of eyewitness identifications. On cross-examination, the state extensively questioned Sommers about whether he

agreed with the testimony of another expert in a different trial and of the opinions of other experts that the procedures used to study the accuracy of eyewitness identifications may not yield reliable results. Defense counsel did not object to these lines of questioning at any time.

The state also presented a hypothetical question to Sommers: "And so isn't it fair to say if I take the train every day, the same train, the 9:05 out of New Haven to Stamford every day and I'm on that train, I see the same person sitting in the same seat on the same car that I sit in every day multiple times. . . . I never speak to him, I don't even know his name. But then one–at one point I see this same person commit a crime. And then at some point later on I'm asked to identify this same person. Wouldn't this witness's identification be more accurate?" Defense counsel did not object to the state's hypothetical question.

The defendant argues on appeal that the state improperly cross-examined Sommers about "out-of-court opinions, which were not Dr. Sommers' prior inconsistent statements." The defendant also argues that the state impermissibly posed a hypothetical question to Sommers which was "based on facts that did not bear any relationship to the evidence adduced." The defendant concedes that his evidentiary claim is not preserved but argues that reversal is appropriate under the plain error doctrine. We do not agree.

"[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. [The supreme] court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . .

"[B]ecause the sine qua non of preservation is fair notice to the trial court . . . the determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated below with sufficient clarity to place the trial court on reasonable notice of that very same claim." (Citations omitted; internal quotation marks omitted.) *State* v. *Jorge P.*, 308 Conn. 740, 753–54, 66 A.3d 869 (2013); see also *State* v. *Duteau*, 68 Conn. App. 248, 256, 791 A.2d 591 ("This court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . . Practice Book § 60-5. Appellate review of evidentiary rulings is ordinarily limited to the specific legal issue raised by the objection of trial counsel. . . . By failing to object . . . the defendant failed to preserve this claim." [Internal quotation marks omitted.]), cert. denied, 260 Conn. 939, 835 A.2d 58 (2002).

After a careful review of the transcript of Sommers' testimony, we could not find a single objection made

by the defendant to the claimed improper lines of questioning by the state during cross-examination. If the defendant had objected, we would address the claim. We conclude that the defendant's evidentiary claim on appeal was not preserved, and we decline to review it. Moreover, as the defendant's claim does not involve error so obvious that it affects the fairness of or public confidence in the judicial proceeding, we conclude that he cannot prevail under the plain error doctrine. See footnote 17 of this opinion.

## III

## PROSECUTORIAL IMPROPRIETY

### A

### Analysis of the Claimed Impropriety

The defendant's third claim is that the prosecutor engaged in multiple acts of prosecutorial impropriety during the prosecutor's closing and rebuttal arguments, which deprived the defendant of his right to due process.[18] The defendant claims that the prosecutor impermissibly: (1) argued facts not in evidence, (2) mischaracterized Sommers' testimony, (3) appealed to the emotions of the jury, and (4) expressed his personal opinion about the credibility of Segura's identifications. We agree with the defendant that the prosecutor engaged in acts of impropriety when he argued facts not in evidence and when he mischaracterized part of Sommers' testimony, but we, nevertheless, conclude that the prosecutor's actions were not so egregious as to deprive the defendant of his right to due process.

We first note that the defendant did not object to most of the alleged improprieties at issue, and his claim is not preserved.[19] We will, nevertheless, review the claim "without resort to an extraordinary level of review." *State* v. *James R.*, 138 Conn. App. 181, 186, 50 A.3d 936, cert. denied, 307 Conn. 940, 56 A.3d 949 (2012). "[A] claim of prosecutorial [impropriety], even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)]." *State* v. *Ritrovato*, 280 Conn. 36, 59 n.17, 905 A.2d 1079 (2006).

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial  .  .  .  ." (Internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 275, 973 A.2d 1207 (2009).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 611, 65 A.3d 503 (2013).

1

Arguing Facts Not in Evidence

The defendant claims that the prosecutor argued facts that were not in evidence during his closing and rebuttal arguments when he suggested to the jury that the defendant would sell stolen property at a pawn shop and when he used a misleading hypothetical. We agree.

"In fulfilling his duties, a prosecutor must confine the arguments to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony that is not the subject of proper closing argument. . . . [Although] the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 697–98, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 272 (2014).

"In deciding cases, however, [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Internal quotation marks omitted.) *State* v. *Rolli*, 53 Conn. App. 269, 281, 729 A.2d 245, cert. denied, 249 Conn. 926, 733 A.2d 850 (1999). "A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence." *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002).

a

Pawn Shop

We agree with the defendant's claim that the prosecutor argued facts not in evidence when the prosecutor stated that the defendant planned to sell Segura's property to a pawn shop. The prosecutor stated that "Mr. Patterson didn't want to hurt anybody. He was just there to get some money, get some jewelry, get some iPads, get some Sony laptops. Get that, go out on the street, sell it; just like he sells bubble guns to Mr. Duarte." He also stated that "once [the defendant] took those belongings, he intended to . . . get some profit from that in terms of *selling them on the street . . . or go*[*ing*] *in*[*to*] *a pawn shop*." (Emphasis added.) During his rebuttal argument, the prosecutor reiterated this argument when he stated that Mr. Patterson "*was going to pawn* that—*pawn that merchandise*, sell it *on the street* like he did to Mr. Duarte." (Emphasis added.)

We have reviewed the record, and we cannot find any evidence that could give rise to a reasonable inference that the defendant planned to sell Segura's property at a pawn shop, and the state has not brought any to our attention. It is common belief that people who steal things often sell them. However, there was no evidence produced at trial that the defendant planned to sell the items he attempted to steal. This could be interpreted as an attempt by the prosecutor to paint the defendant as an experienced criminal.

b

Hypothetical Question

We also agree with the defendant's claim that the prosecutor, in essence, argued facts that were not in evidence when the prosecutor presented the "improper, misleading hypothetical train ride question" he had questioned Sommers about on cross-examination. The prosecutor stated that "if . . . you see a stranger on the train *every day*, we take the *same train together*. We don't really know each other's names, we don't talk. We just see each other. And I see the same person commit a crime and I tell police . . . Dr. Sommers said that there's no reason to do a double-blind lineup. In this case, *the same facts apply* and we did do a line up and he picked the right guy." (Emphasis added.) During his rebuttal argument, the prosecutor invited the jury to "recall the train example I used with Dr. Sommers. I gave an example to Dr. Sommers when he was—when he was sitting there about if you *took the same train every day*, you never talked to this person, you never even—you never had a conversation, didn't know his name, never talked to him. You took the train with him and you *recognized him from just from that train.* . . . Dr. Sommers sat there and said there would be no reason to even do a lineup . . . [H]e said that that was enough. If you saw somebody doing a crime, even

if you didn't know their name, didn't—and never really talked to him and just saw him on the train *the same time every day*. You saw that person commit a crime, that that identification would be accurate . . . *the same facts apply*. Mr. Segura had seen the . . . defendant . . . in the past. . . . He saw him around the neighborhood . . . ." (Emphasis added.)

We understand that the use of hypotheticals in an argument inherently poses challenges to the advocate. Given the circumstances in the present case, however, we conclude that the facts in the hypothetical did not accurately reflect the evidence adduced at trial. See *State* v. *Leroy*, 38 Conn. App. 282, 286, 661 A.2d 106 ("[t]he facts assumed in a hypothetical question must have their basis in the evidence on the record" [internal quotation marks omitted]), cert. denied, 235 Conn. 904, 665 A.2d 904 (1995). The hypothetical posited that one would be more likely to make an accurate identification of an individual if he or she saw that individual *every day* at the *same time* and in the *same place* as opposed to never having seen that individual before. In the present case, neither Segura nor Duarte testified that they observed the defendant every day at the same time and in the same place. Rather, Segura testified that he had only seen the defendant on a couple of occasions "[i]n the store, [and] out on the street," and Duarte had only seen the defendant on three or four occasions in different places. Because the facts in the hypothetical were wholly different from the facts that were adduced at trial, the argument was improper.

2

Mischaracterization of Expert Testimony

The defendant claims that the prosecutor mischaracterized Sommers' testimony. We agree in part with the defendant.

First, the prosecutor stated that "Dr. Sommers said if an [identification] is done quickly, you point to that photo quickly, that increases your accuracy." Second, the prosecutor stated that "*Dr. Sommers said that* . . . a photo lineup didn't even need to be done and that [Duarte's and Segura's] identification[s] [were] enough." (Emphasis added.) The prosecutor next stated that "[the police officers] weren't even doing anything that they had to do. *Dr. Sommers said it.* They didn't have to do [the photographic lineup]."[20] (Emphasis added.)

We conclude that the first comment regarding the speed with which an identification is made was proper. The prosecutor merely invited the jury to make the reasonable inference that because Sommers testified that an identification is more likely to be accurate if one makes it quickly, Segura's and Duarte's identifications were accurate due to the speed in which they made the identifications. We conclude, however, that the second

set of comments regarding the need for a lineup were improper. We acknowledge that prosecutors must be given some leeway in "the heat of argument"; (internal quotation marks omitted) *State* v. *Medrano*, supra, 308 Conn. 611; but our review of the record reveals no testimony during which Sommers explicitly stated that a "photo lineup didn't need to be done" *in the present case* and that it was unnecessary for police to conduct a photographic lineup with Segura and Duarte. Instead of urging the jury to make a reasonable inference from Sommers' testimony that the identifications were accurate, the prosecutor prefaced his statements with "Sommers said that," which communicated to the jury that the prosecutor was recollecting actual statements made by Sommers. See *State* v. *Ross*, supra, 151 Conn. App. 698–99 (prefacing phrases with " 'he stated' " and " 'he told you' " improperly "place[d] words in the mouth of a witness"); *State* v. *Sargent*, 87 Conn. App. 24, 40, 864 A.2d 20 (prefatory phrase that "[the witness] indicated to you" conveyed to jury that prosecutor was recounting witness' actual testimony), cert. denied, 273 Conn. 912, 870 A.2d 1082 (2005). Therefore, the prosecutor in part improperly mischaracterized Sommers' testimony.

3

Appealing to the Emotions of the Jury

The defendant claims that the prosecutor improperly appealed to the emotions of the jury. We disagree.

The prosecutor stated that Segura and Espitia were "pretty much teenagers" and that this was a "very stressful event." The prosecutor also stated that Segura and Espitia did not know "if [the incident] was a life or death situation."

"It has long been held that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Nonetheless, closing arguments often have a rough and tumble quality about them, [and] some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Cromety*, 102 Conn. App. 425, 433–34, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007).

After reviewing the record, we conclude that the prosecutor based his comments on facts that were drawn from the evidence and that the jury could have drawn reasonable inferences from these facts. The prosecutor's comments were not calculated to lead the jury to find the defendant guilty out of sympathy for Segura and Espitia. Instead, the prosecutor took the opportunity to cast Segura and Espitia in a sympathetic light without distracting the jury from the main point of his argument, mainly, that the defendant was the person responsible for attempting to steal Segura's property. See, e.g., *State v. Ceballos*, 266 Conn. 364, 394–95, 832 A.2d 14 (2003). We conclude that the prosecutor did not improperly appeal to the emotions of the jury.

### 4

### Expressing Personal Opinion

Finally, the defendant claims that the prosecutor impermissibly expressed his personal opinion about the credibility of the identification evidence. We disagree.

The prosecutor argued that the police "had four identifications ten minutes after the crime. . . . [The photographic lineup identification by Segura] wasn't necessary for me to bring charges against [the defendant]. I already had the identification ten minutes after this crime had already occurred."

"[A] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . It is not, however, improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . .

"Although prosecutors generally should try to avoid using phrases that begin with the pronoun I . . . we recognize that the use of the word I is part of our everyday parlance and . . . because of established speech patterns, it cannot always easily be eliminated completely from extemporaneous elocution. . . . Furthermore, [t]he state's attorney should not be put in the rhetorical straightjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows . . . . Therefore, if it is clear that the prosecutor is arguing from the evidence presented at trial, instead of giving improper unsworn testimony with the suggestion

of secret knowledge, his or her occasional use of the first person does not constitute misconduct. (Citations omitted; internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 435–36, 902 A.2d 636 (2006).

Contrary to the defendant's characterization of the prosecutor's comment, the prosecutor did not give a personal opinion. We note that the prosecutor used the term "I" in his statement, but he merely highlighted to the jury the evidence presented at trial, namely, that Segura had seen the defendant three times in his home and once when he was walking outside. The argument explains why the prosecutor charged the defendant, not whether he believed the identification was accurate. Thus, the prosecutor did not commit an impropriety.

B

Due Process Analysis

Because we conclude that the prosecutor committed improprieties, we now turn to the second step of our two part analysis. "To determine whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in [*Williams*], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Devito*, 159 Conn. App. 560, 573, 124 A.3d 14, cert. denied, 319 Conn. 947, 125 A.3d 1012 (2015). "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012).

After considering the *Williams* factors, and while remaining cognizant of the fact that the defendant objected to only *one* of the improprieties; see *State* v. *Stevenson*, 269 Conn. 563, 591, 849 A.2d 626 (2004); we conclude that the prosecutor's comments during closing and rebuttal arguments did not deprive the defendant of a fair trial.

The first factor, whether the defendant invited the improprieties, weighs in favor of the defendant. There is nothing in the record to suggest that the defendant invited the prosecutor to make any of the comments at issue.

The second factor, the severity of the improprieties,

weighs in favor of the state. Defense counsel did not object to the pawn shop comments or to the use of the hypothetical. "[W]e consider it highly significant that defense counsel failed to object to any of the improper remarks, request curative instructions, or move for a mistrial. Defense counsel, therefore, presumably [did] not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial. . . . Given the defendant's failure to object, only instances of grossly egregious [impropriety] will be severe enough to mandate reversal." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 479–80, 832 A.2d 626 (2003). We do not consider the prosecutor's comments to even approach the sort of grossly egregious misconduct requiring reversal. To the extent that defense counsel objected to the mischaracterization of Sommers' testimony, we note that defense counsel failed to take any curative measures, such as asking the court for a jury instruction to disregard the comments, which indicates that defense counsel presumably did not think that the comments were so severe as to have a negative effect on the jury. Whether defense counsel objected to the impropriety, moreover, is only one factor in determining whether an impropriety was so severe as to affect the outcome of a trial—the existence of an objection, by itself, is not enough to deem an impropriety so severe that it violates the defendant's right to a fair trial. See, e.g., *State* v. *Warholic*, 278 Conn. 354, 399, 897 A.2d 569 (2006) ("despite defense counsel's objection to this line of questioning, [the impropriety] was not severe").

The third factor, the frequency of the comments, weighs in favor of the state. The pawn shop comment and the mischaracterization of Sommers' testimony were confined to a small portion of closing and rebuttal arguments, "where we typically allow some latitude . . . ." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 151 Conn. App. 701. While the prosecutor used the hypothetical during both cross-examination and closing arguments, and it cannot be considered an isolated incident; see *State* v. *Warholic*, supra, 278 Conn. 398; it is significant to note that the hypothetical was only mentioned three times throughout the trial, two of which that were confined to closing and rebuttal arguments. See *State* v. *Medrano*, supra, 308 Conn. 620.

The fourth factor, whether the improprieties related to a critical issue in the case, does not clearly favor either party. The main issue in the case was the identity of the perpetrator of the crime. The pawn shop statements were unrelated to this issue, as they were only comments about what the defendant planned to do with the stolen items. However, both the hypothetical and the mischaracterization of Sommers' testimony commented on the reliability of Segura's and Duarte's identifications. Because the prosecutor's case primarily relied

on the reliability of these identifications, the statements were relevant to the critical issue of the case. See *State* v. *Sargent*, supra, 87 Conn. App. 41.

The fifth factor, whether the court gave curative instructions, weighs in favor of the state. The court did not give a special instruction to the jury to disregard the statements at issue. The court did, however, give a general instruction that closing arguments are not considered evidence but are only "intended to help [the jury] interpret the evidence" and that if a member of the jury remembers a fact differently than what was presented during closing arguments, his or her "memory . . . controls." Importantly, "the defendant, by failing to bring them to the attention of the trial court, bears much of the responsibility for the fact that these claimed improprieties went uncured." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 597. In the present case, the failure by the defendant to request specific curative instructions presumably indicates that defense counsel did not believe that the general instructions given by the court failed to protect his rights. See id. Moreover, the defendant has not demonstrated that the jury failed to follow the court's instructions.

The sixth factor, the strength of the state's case, weighs in favor of the state. It presented a solid case against the defendant for both the burglary in the second degree charge and attempted larceny in the fifth degree charge. For the burglary charge, Segura testified that he clearly saw the defendant's face while the defendant was in his residence. He also quickly identified the defendant in a double-blind, sequential photographic lineup and from the news article as the man who was in his residence. Duarte testified that he saw the defendant's face as he exited Segura's residence, and he identified the defendant in a double-blind, sequential photographic lineup more than one year later as the man he saw exiting the residence. A jury reasonably could have inferred that the defendant was in Segura's residence with the intent to commit a crime. For the attempted larceny charge, Segura testified he found his property on his couch after the defendant left his residence. He also testified that his brother's coin jar had been moved. A jury reasonably could have inferred that the defendant moved all of the items in an attempt to take them out of the residence without Segura's permission.

After considering all of the *Williams* factors in the context of the entire trial, we conclude that the defendant was not deprived of his right to a fair trial because there was no reasonable likelihood that the jury's verdict would have been different absent the sum of the improprieties.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] "A double-blind photographic identification procedure is one in which the officer conducting [the procedure] has not been involved in the investigation and does not know who the target is." (Internal quotation marks omitted.) *State* v. *Grant*, 154 Conn. App. 293, 305 n.4, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015).

[2] "A sequential photographic identification procedure involve[s] showing the witness the suspect and other fillers on the identification procedure one at a time, rather than the traditional practice of simultaneous presentation." (Internal quotation marks omitted.) *State* v. *Grant*, 154 Conn. App. 293, 305 n.5, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015).

[3] Peter Dispagna, a sergeant of the Stamford Police Department (department), testified during the suppression hearing that the department is no longer permitted to use "photo arrays." Instead, the department uses photographic lineups. A photographic lineup is a standard procedure in which a witness is shown eight photographs, and there is one photograph per page. See General Statutes § 54-1p.

[4] Duarte testified that he saw the defendant "in the street" approximately three or four times. It is unclear from Duarte's testimony as to whether he purchased the toy bubble gun from the defendant on the street or somewhere else.

[5] The defendant does not argue that Segura's identification was the product of unnecessarily suggestive police conduct but only contends that Duarte's identification was the product of unnecessarily suggestive police conduct.

[6] The defendant also claims that the photographic lineup identifications were otherwise unreliable. Because we conclude that the photographic lineups were not unduly suggestive, we need not address this claim. See State v. Grant, 154 Conn. App. 293, 299 n.1, 112 A.3d 175 (2014) ("[b]ecause we determine that the identification procedures utilized by the police were not unnecessarily suggestive, it is unnecessary for us to address . . . his [unreliability] claim"), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015).

[7] Because we conclude that the private actor identification was not subject to unnecessarily suggestive conduct, we do not reach the question of whether the identifications were otherwise unreliable. See *State* v. *Holliman*, 214 Conn. 38, 49, 570 A.2d 680 (1990) ("[s]ince we conclude that the [private actor] identification procedure was not unnecessarily suggestive, we will not gratuitously lengthen this opinion by considering the reliability of the resulting identification").

[8] Dispagna chose the fourteen other photographs used in the two eight person photographic lineups through the standard computer system utilized by the department called "RMS," or record management system (system). The system contains an icon that allows an officer to enter certain parameters into the system, such as age, weight, height, and hair type. Then, the system brings up photographs of individuals that match the parameters.

[9] Dispagna testified during the suppression hearing that as opposed to matching ages, he tried to "match the facial wrinkles" of the defendant to the other individuals. In addition, Dispagna testified that the defendant did not "look a day over thirty-five so [Dispagna] fe[lt] very comfortable in showing . . . younger m[e]n." Neither the dates of birth nor the ages of the individuals were included in the photographic lineup shown to Segura.

[10] The hair styles included "bald," "very slight," "close on the sides [and] a little lower on top," and "flat-top."

[11] Most of the individuals only had slight amount of hair. Only one individual was characterized has having "a lot of hair."

[12] The court found that "there was nothing improper about the degree of likeness shared by the individuals pictured in each photo array. There was nothing improper about the number of photos used, the defendant's photo was not prominently displayed or otherwise impermissibly highlighted, there is no evidence that either witness was told that the suspect was in the array, there is no evidence that the officers administering the procedures did anything to influence the two witnesses in making their identification," and, therefore, the defendant "failed to meet his burden of proving that the photo arrays were unnecessarily suggestive."

The court also found that "the identifications were reliable based on the totality of the circumstances."

[13] The court found that "based on the testimony of Mr. Segura and Mr. Duarte, as well as the other evidence presented, the court does not find their conduct to be unnecessarily suggestive."

The court also found that under the "the totality of the circumstances," their conduct was "reliable at a level sufficient for the issue to go to the jury."

[14] Both identification procedures were double-blind, sequential photographic lineups, which the defendant in his brief does not contend was an unnecessarily suggestive procedure.

[15] In conducting the required two-pronged inquiry of whether Segura's conduct was unnecessarily suggestive and whether the identification was nevertheless reliable, the trial court acknowledged Chief Justice Rogers' concurrence in *Johnson*, in which the chief justice suggested that the Supreme Court should abandon the two-pronged test adopted in *Holliman* and "instead hold, as did the United States Supreme Court in *Perry* v. *New Hampshire*,     U.S.     , 132 S. Ct. 716, 730, 181 L. Ed. 2d 694 (2012), that potentially unreliable eyewitness identifications resulting from suggestive procedures undertaken by private actors should be evaluated like any other potentially unreliable evidence—namely, by a fully informed, properly instructed jury within the confines of a trial employing the usual array of constitutional safeguards." *State* v. *Johnson*, supra, 312 Conn. 707 (*Rogers, C. J.*, concurring). The Chief Justice articulated a number of reasons why the two-pronged inquiry should be eliminated; see id., 710–13; and we agree that the safeguards discussed in her concurring opinion are sufficient to ensure that eyewitness identifications admitted at trial are reliable.

[16] In coming to this conclusion, we note that there is very little case law that discusses the issue of whether an eyewitness identification should be excluded because it was the product of unnecessarily suggestive private conduct and is otherwise unreliable. See, e.g., *State* v. *Johnson*, supra, 312 Conn. 706 (declining to review defendant's claim that victim's identification was product of unnecessarily suggestive private conduct because defendant did not preserve claim for review); *State* v. *Holliman*, supra, 214 Conn. 47–48 (private actor's identification was not unnecessarily suggestive in light of exigent circumstances); see also *Perry* v. *New Hampshire*, supra, 132 S. Ct. 730 (preliminary judicial assessment of eyewitness identifications made under suggestive circumstances are not necessary because reliability can be adequately tested through general rights and opportunities granted to defendants in criminal trials); *People* v. *Marte*, 12 N.Y.3d 583, 589, 912 N.E.2d 37, 884 N.Y.S.2d 205 (2009) (declining to create constitutional rule of exclusion to cases where identification results from suggestive conduct by private citizen), cert. denied, 559 U.S. 941, 130 S. Ct. 1501, 176 L. Ed. 2d 117 (2010).

[17] The defendant seeks redress pursuant to the plain error doctrine for both evidentiary claims. "[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. . . . [T]he plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly." (Internal quotation marks omitted.) *State* v. *Sease*, 147 Conn. App. 805, 815 n.7, 83 A.3d 1206, cert. denied, 311 Conn. 932, 87 A.3d 531 (2014). We conclude that the defendant fails to meet this demanding standard.

[18] The defendant also claims that the prosecutor committed prosecutorial improprieties during his cross-examination of Sommers. We decline to review his unpreserved evidentiary claim, "which masquerades as a constitutional claim of prosecutorial misconduct." *State* v. *Lindo*, 75 Conn. App. 408, 421, 816 A.2d 64, cert. denied, 263 Conn. 917, 821 A.2d 771 (2003).

[19] The defendant did object to the prosecutor mischaracterizing Sommers' testimony during rebuttal arguments.

[20] The defendant also claims that the prosecutor mischaracterized Sommers' testimony when he stated that Segura "*identified* [the defendant] six times," when he stated that Segura made "three *identifications* [of the defendant] while he was behind the door," and when he stated that Segura "made four *identifications* ten minutes after the crime." (Emphasis added.) The defendant argues that Sommers actually testified that in order for an observation to be considered an "identification" in the scientific sense, it must comport with "three stages of memory," so labeling Segura's observations as "identifications" mischaracterized Sommers' testimony and bolstered Segura's credibility. We find no merit to this argument because when reviewing the comments in context, the prosecutor did not refer to Sommers' testimony but merely to the fact that Segura observed the defendant during the incident and was able to choose the defendant from a photographic lineup.