******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOESENIER
RUIZ-PACHECO
(AC 39605)

Prescott, Elgo and Harper, Js.

*Syllabus*

Convicted of the crimes of assault in the first degree, attempt to commit
murder and conspiracy to commit assault in the first degree in connec-
tion with the stabbing of the victims, T and R, the defendant appealed.
He claimed, inter alia, that his conviction of two counts of assault in
the first degree as an accessory violated the double jeopardy clause and
that certain of the trial court's jury instructions were improper. The
defendant and his brother, E, had left a nightclub and gone to an adjacent
parking lot, where the defendant punched his former girlfriend, M, in
the face and put her in a headlock. Thereafter, T punched the defendant,
who then released M from the headlock, and the defendant, E, T and
R began to fight. The defendant and E stabbed T multiple times, and
the defendant stabbed R two or three times. The defendant and E then
ran after R, and E stabbed R, who tumbled down a portion of grass.
The defendant then approached R and stabbed him. The state charged
the defendant with, inter alia, one count each of assault in the first
degree as a principal and an accessory as to the stabbings of T, and
one count each of assault in the first degree as a principal and an
accessory as to the stabbings of R. *Held*:

1. The defendant could not prevail on his unpreserved claim that his convic-
tion of two counts each of assault in the first degree as a principal and
as an accessory violated his right against double jeopardy, and, thus,
that his conviction of the accessory counts should be vacated:

a. The acts of stabbing as to R were susceptible of separation into
distinct criminal acts for which the defendant could be punished without
offending principles of double jeopardy, as the jury reasonably could
have predicated its finding that the defendant committed assault as a
principal on the basis of the first or third of the stabbing incidents
involving R, each of which was completed by the defendant, there was
no doubt that the defendant's stabbing of R after R left the initial brawl
was a criminal act that was distinct and separate from the stabbings
that the defendant and E initially inflicted on R, and the jury's finding
that the defendant engaged in an assault as an accessory could have
been predicated on his having aided E in the second act of stabbing R;
moreover, the information contained four separate and distinct counts
for each assault charge, the state did not suggest to the jury that the
assault charges were alternative theories of liability, but presented evi-
dence that the defendant and E stabbed each victim, and the state argued
that the evidence supported a finding that the defendant acted as an
accessory by being there with a knife.

b. The jury reasonably could have determined that the defendant was
guilty as a principal actor for the stab or stabs that he personally inflicted
on T and as an accessorial actor for intentionally aiding in the nearly
simultaneous stab or stabs that E inflicted on T; the jury was free to
resolve conflicting evidence by concluding that the defendant and E
stabbed T, and that the defendant was liable for assault in the first
degree on the basis of his stabbing of T and as an accessory for E's
stabbing of T, which was a contemporaneous yet separate assault with
independent legal significance because the defendant had engaged in
conduct with the intent to aid E's assault, and because the defendant's
multiple punishments for assault as to each victim were not premised
on a single criminal act, but were based on distinct repetitions of the
same crime, the trial court was not constitutionally required to vacate
the defendant's conviction of two counts of assault in the first degree
as an accessory.

2. The defendant could not prevail on his unpreserved claim that he was
deprived of a fair trial as a result of the trial court's jury instructions
on attempted murder, which was based on his assertion that the court
misled the jury when it utilized the phrase, "engaged in anything," in

three instances, read the full statutory definition of general and specific intent, and failed to adequately define the substantial step element for attempt: it was not reasonably possible that the instructions, when viewed as a whole, misled the jury, as they adequately conveyed to the jury that to find the defendant guilty, it must find that he had the specific intent to cause death, the words, "engaged in anything," as used by the court did not affect the specific intent requirement in the applicable statute (§ 53a-3 [11]) but, rather, referred to conduct that constituted a substantial step toward the commission of the crime, and the court explained that the jury did not need to concern itself with what general intent meant; moreover, the court instructed the jury that a person acts intentionally with respect to a result when his conscious objective is to cause such a result, and, to the extent that the defendant claimed that separate claims of error taken together deprived him of a fair trial, our Supreme Court previously has rejected the cumulative error approach regarding claims of instructional error.

3. The defendant could not prevail on his unpreserved claim that the trial court improperly instructed the jury on the defenses of self-defense and defense of others, and on the lesser included offenses of assault in the second degree and assault in the third degree, which was based on his assertion that the court's instructions on self-defense permitted the jury to consider the lesser included offenses if the state failed to disprove self-defense beyond a reasonable doubt: the defendant waived his right to challenge the instructions, as he had a meaningful opportunity at trial to review them, and he assented to them and expressed no concerns regarding revisions to the charge or to the charge as given to the jury; moreover, even if the instructions constituted obvious and undebatable error, the defendant could not establish manifest injustice or fundamental unfairness pursuant to the plain error doctrine because the jury returned a verdict of guilty on the charged offenses and not on any of the lesser included offenses.

4. The defendant's claim that multiple instances of prosecutorial impropriety during closing arguments deprived him of a fair trial because they negatively impacted his claims of self-defense and third-party culpability was unavailing:

a. The prosecutor's argument that the defendant was the initial aggressor due to his assault of S was based on the facts in evidence and, thus, was not improper; the court instructed the jury regarding the state's burden to prove that the defendant was the initial aggressor in the encounter with R and T, and the defendant failed to cite any law to support his claim that he could be the initial aggressor only if he was the first person to threaten or use force against T or R.

b. The prosecutor did not directly urge the jury to draw an adverse inference by virtue of E's absence or suggest that the defendant had the burden to produce evidence in support of his defense; the prosecutor's reference to the lack of evidence for the defendant's theory of the case, which was that E was the initial aggressor, was not improper.

c. The prosecutor did not improperly appeal to the emotions of the jurors when he referred to R and T as good Samaritans; the prosecutor's comments were based on reasonable inferences from the facts in evidence, and he utilized his closing arguments to explain the motivations of R and T for approaching the defendant, and argued that the defendant was the initial aggressor.

d. The prosecutor did not improperly make arguments based on facts that were not in evidence when he argued that two witnesses saw the defendant stab T, when he stated that the defendant was the brother of a certain person who was referred to by a nickname, or when he discussed the testimony of two police officers who had witnessed the fight; the prosecutor's statements were supported by testimony and evidence, or were proper inferences drawn from the evidence, and even if the prosecutor's argument about the testimony of two police officers who witnessed the fight was improper, the court's cautionary instructions to the jury were sufficient to cure any harm to the defendant.

Argued November 28, 2017—officially released September 25, 2018

*Procedural History*

Substitute information charging the defendant with four counts of the crime of assault in the first degree, and two counts each of the crimes of attempt to commit

murder and conspiracy to commit assault in the first degree, brought to the Superior Court in the judicial district of Danbury and tried to the jury before *Eschuk, J.*; verdict of guilty of four counts of assault in the first degree, two counts of conspiracy to commit assault in the first degree and one count of attempt to commit murder; thereafter, the court vacated the verdict as to one count of conspiracy to commit assault in the first degree and rendered judgment in accordance with the verdict, from which the defendant appealed. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, *Warren C. Murray*, supervisory assistant state's attorney, and *Laurie N. Feldman*, special deputy assistant state's attorney, for the appellee (state).

*Opinion*

ELGO, J. The defendant, Joesenier Ruiz-Pacheco, appeals from the judgment of conviction, rendered after a jury trial, of two counts of assault in the first degree as a principal in violation of General Statutes § 53a-59 (a) (1), two counts of assault in the first degree as an accessory in violation of General Statutes §§ 53a-59 (a) (1) and 53a-8, one count of attempt to commit murder in violation of General Statutes § 53a-54, and one count of conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-48.[1] On appeal, the defendant claims that (1) his conviction of the assault counts violates the double jeopardy clause; (2) the jury instructions on attempted murder were improper; (3) the court's repeated instruction that the jury should consider the lesser included offenses even if the state failed to disprove self-defense on the greater offenses misled the jury; and (4) he was deprived of a fair trial due to prosecutorial improprieties that affected the critical issues of self-defense and third-party culpability. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to the defendant's appeal. On November 30, 2012, the defendant went to El Milenio, a nightclub in Danbury, with his brother, Eliezer, and his friends, Raymond Martinez and Eiliana Martinez. A group of women, Dumilka Adames, Samantha Medina, Petra Mendez, Carina Amaro, and Rita Santos, also attended the nightclub. At approximately 2 a.m. on December 1, 2012, the nightclub closed and the group of women walked to their cars, which were parked in the adjacent C-Town grocery store parking lot. Kenneth Tucker, who had attended a different nightclub, was waiting in the parking lot to meet up with the group of women. The defendant and his associates also walked to the C-Town grocery store parking lot. Adames got into Santos' car with Tucker. Medina and Mendez got into Amaro's car.

At some point, the defendant and Eliezer approached Amaro's car. Eliezer and Mendez exchanged words. Medina, the defendant's former girlfriend, got out of the car and argued with him. The defendant then punched Medina in the face and put her in a headlock. Other people in the parking lot, including Tucker and Luis Rodriguez, another bystander, saw the defendant put Medina in a headlock. Medina yelled at the defendant to let her go. Tucker punched the defendant, and the defendant released Medina from the headlock. Tucker, the defendant and Eliezer then immediately began to fight with their fists. Rodriguez also entered the fray after he saw the defendant hit Medina. At some point during the fight, the defendant and Eliezer went to their car to arm themselves; Eliezer obtained a knife for himself from the car and handed a knife to the defen-

dant. Tucker and Rodriguez were unarmed. Throughout the course of the fight in the parking lot, the defendant and Eliezer stabbed Tucker multiple times. The defendant also stabbed Rodriguez two or three times. When the defendant and Eliezer walked away, Rodriguez said something to the brothers. In response, the defendant and Eliezer ran after Rodriguez, and Eliezer stabbed Rodriguez in the back. After Eliezer stabbed him, Rodriguez tumbled down a portion of grass between the parking lot and the sidewalk. The defendant then approached Rodriguez, who was in the street unable to move as a result of his injuries, stabbed him in the left side of the chest and said: "This is for hitting my brother." The defendant and Eliezer thereafter fled the scene together in a vehicle. Two off-duty police officers witnessed a portion of the fight and rendered medical assistance to Rodriguez after he was stabbed. Rodriguez sustained five stab wounds and Tucker sustained three stab wounds.

The defendant was arrested later that night. The police took the defendant's statement in which the defendant admitted that he "stabbed a person in self-defense . . . ." The state charged the defendant with two counts of assault in the first degree as a principal in violation of § 53a-59 (a) (1), two counts of assault in the first degree as an accessory in violation of §§ 53a-59 (a) (1) and 53a-8, two counts of attempted murder in violation of § 53a-54, and two counts of conspiracy to commit first degree assault in violation of §§ 53a-59 (a) (1) and 53a-48. At trial, the state presented eyewitness testimony, including that of Mendez, Adames, Tucker, Rodriguez, Liybin Fernandez, Officer Kristin Lindstrom, and Officer David Dubord. Following a jury trial, the defendant was found guilty on all counts except for one count of attempted murder (count five), and the jury's guilty verdict on one count of conspiracy to commit assault in the first degree (count eight) was vacated at sentencing.[2] This appeal followed.

I

The defendant first claims that his conviction of assault in the first degree as a principal pursuant to counts two and six of the information, and assault in the first degree as an accessory pursuant to counts three and seven of the information, violates his fifth and fourteenth amendment right against double jeopardy. Accordingly, he contends that his conviction of the two counts of assault as an accessory should be vacated. The state argues that because the defendant's conviction of the four counts was based on different acts, his double jeopardy rights were not violated. We agree with the state.

The following additional facts are relevant to our resolution of the defendant's claim. The information in the present case charged the defendant with four separate counts of first degree assault. In relevant part,

the information contained one count each of assault in the first degree as a principal and assault in the first degree as an accessory with respect to the stabbing injuries suffered by Rodriguez,[3] and separate counts of assault in the first degree as a principal and assault in the first degree as an accessory with respect to the stabbing injuries sustained by Tucker.[4] The defendant never sought a bill of particulars.

In discussing the nature of the charges in its closing argument, the state argued that there were many possible combinations whenever there are at least two persons stabbing two victims and that multiple counts were appropriate in this case "to accommodate all those situations." The state argued that there was evidence that both the defendant and his brother, Eliezer, armed themselves with knives during the conflict and that both victims were stabbed multiple times. According to the prosecutor, the jury had the obligation of sorting out the conflicting evidence presented and to determine whether the defendant himself had stabbed both victims or had helped his brother stab the victims "just by being there with the knife himself." The state did not expressly rule out that some combination was also possible. In fact, at no time did the state suggest to the jury that it was proceeding on a theory of alternative liability or that the jury was limited to finding the defendant guilty either solely as a principal or solely as an accessory with respect to the two victims.

In her closing argument, defense counsel also noted the conflicting evidence that existed with respect to who had stabbed each of the victims and argued that it was the jury's duty to reach a determination on the basis of the evidence before it. The defense theory was that it was Eliezer who stabbed the victims, not the defendant, but that if the jury found otherwise, it should still find the defendant not guilty because he had acted in self-defense or in defense of others. At no point did the defense argue to the jury that if it found the defendant guilty of assaulting the victims as a principal, it could not also find him guilty of acting as an accessory.

In its instructions to the jury regarding the charges against the defendant, the court told the jury that the defendant was "entitled to and must be given by you a separate and independent determination of whether he's guilty or not guilty as to each of the counts" charged, and that "[e]ach of the counts charged is a separate crime." The defendant did not object to the instruction given by the court or ask for clarification about whether he potentially could be found guilty on all counts or whether certain counts were pleaded only in the alternative.

With that background in mind, we address the reviewability of the defendant's claim. The defendant acknowledges that he failed to raise any double jeopardy claim before the trial court and, thus, seeks review of his

claim pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). *Golding* provides that "[a] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis omitted; footnote omitted.) Id., 239–40; see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*). We conclude that the first two prongs of the *Golding* test have been met because the record before us is adequate to review the defendant's claim and a double jeopardy claim raises an issue of constitutional magnitude. See *State* v. *Estrada*, 71 Conn. App. 344, 357, 802 A.2d 873, cert. denied, 261 Conn. 934, 806 A.2d 1068 (2002). We, thus, direct our attention to the third prong and whether the defendant's claimed double jeopardy violation exists.

Before turning to our discussion of the law relative to the defendant's double jeopardy claim, it is important to emphasize what the defendant is not claiming. He is not claiming that there was insufficient evidence from which the jury could find him guilty, either as a principal or as an accessory, of assaulting the two victims with the intent to cause serious bodily injury. In other words, he has not argued that there was insufficient evidence from which the jury could conclude that he stabbed the two victims *and* that he engaged in conduct with the intent to aid Eliezer in Eliezer's assault of each of the victims. The claim he makes on appeal is simply that it is constitutionally impermissible under the facts of this case to allow his conviction of multiple counts of assault as to each victim to stand because, in his view, doing so would result in his being punished twice for the same act.

"A defendant's double jeopardy claim presents a question of law, over which our review is plenary. . . . The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb. The double jeopardy clause [applies] to the states through the due process clause of the fourteenth amendment. . . . This constitutional guarantee prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense in a single trial." (Internal quotation marks omitted.) *State* v. *Porter*, 328 Conn. 648, 654–55, 182 A.3d 625 (2018).[5]

In analyzing a double jeopardy claim arising in the

context of a single trial, we apply a well established two step process. "First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v. *Bernacki*, 307 Conn. 1, 9, 52 A.3d 605 (2012), cert. denied, 569 U.S. 918, 133 S. Ct. 1804, 185 L. Ed. 2d 811 (2013).

In *State* v. *Porter*, supra, 328 Conn. 648, our Supreme Court clarified the type of evidence an appellate court should consider in applying this two step process. In evaluating the first step, i.e., whether the charges arise out of the same act or transaction, "we look to the evidence at trial and to the state's theory of the case . . . in addition to the information against the defendant, as amplified by the bill of particulars. . . . If it is determined that the charges arise out of the same act or transaction, then the court proceeds to step two, where it must be determined whether the charged crimes are the same offense. . . . [In considering the] second step . . . we look only to the information and bill of particulars—as opposed to the evidence presented at trial . . . . Because double jeopardy attaches only if both steps are satisfied . . . *a determination that the offenses did not stem from the same act or transaction renders analysis under the second step unnecessary.* (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 662. Because we conclude in the present case that the defendant's double jeopardy claim founders on the first step of the analysis, it is unnecessary to consider whether the charged crimes are the same offense under the rubric set forth in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

"[D]istinct repetitions of a prohibited act, *however closely they may follow each other* . . . may be punished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [*T*]*he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the* [*statute*]." (Emphasis altered; internal quotation marks omitted.) *State* v. *Brown*, 299 Conn. 640, 652, 11 A.3d 663 (2011). Accordingly, although the counts in an information may rely on factual allegations arising from one overarching criminal event, if it is possible to isolate distinct acts that occurred during that event that constitute separate and severable criminal offenses, prosecution of those offenses will not implicate double jeopardy. "[A]n appellate court reviewing an unpreserved claim of double jeopardy must examine

the evidence to determine whether the alleged transaction logically can encompass separate acts, which in turn form the basis of separate convictions." *State* v. *Porter*, 167 Conn. App. 281, 290–91, 142 A.3d 1216 (2016), aff'd, 328 Conn. 648, 182 A.3d 625 (2018).

By way of example, in *Brown*, the defendant and several coconspirators participated in a scheme to rob a suspected drug dealer that ended with that dealer being killed by the defendant. *State* v. *Brown*, supra, 299 Conn. 644–46. The defendant was convicted of felony murder and murder, which were merged prior to sentencing, and robbery in the first degree, attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and other crimes related to the use of a firearm. Id., 646. On appeal, the defendant raised an unpreserved double jeopardy claim, arguing that his conviction of both robbery and attempted robbery arose out of the same transaction, and, therefore, his sentence for attempted robbery should be vacated. Id., 650. The court disagreed because the evidence presented at trial showed that acts constituting an attempted robbery reasonably could be isolated from other acts constituting a separate robbery and, therefore, punishing the defendant for both crimes did not violate the constitution. Id., 654.

Specifically, the court concluded that the jury reasonably could have found, on the basis of the evidence presented, that the attempted robbery had occurred when the victim was first confronted in his car by the defendant's three coconspirators, one of whom pointed a gun at his head. Id., 653. Following a struggle for control of the gun, the victim escaped and began to run down the street. Id. The court found that the actions up to that point constituted a completed attempted robbery. Id. The defendant, who had run after the victim when he escaped from the car, was able to catch him when the victim tripped and fell. The defendant then shot the victim in the head and went through the victim's pockets, which the court viewed as constituting a separate and distinct act of robbery. Thus, the court concluded that in the course of the single criminal conspiracy, the defendant had participated in two separate and severable crimes that happened close together in both time and physical proximity—an attempted robbery as an accessory and a robbery acting as the principal. Id., 653–54.

The double jeopardy analysis in the present case is, at least at first blush, complicated by the fact that all the stabbing injuries to the victims occurred within a very short duration of each other, and that the defendant was charged with having committed an assault of each of the victims and as an accessory to an assault of each of the victims by Eliezer. It is true that "[t]his state . . . long ago adopted the rule that there is no practical significance in being labeled an accessory or

a principal for the purpose of determining criminal responsibility. . . . Under the modern approach, a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime. . . . [T]here is no such crime as being an accessory . . . . The accessory statute merely provides alternate means by which a substantive crime may be committed." (Citations omitted; internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 340–41, 696 A.2d 944 (1997).

Section 53a-8 (a) provides in relevant part that "[a] person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct . . . ." To intentionally aid someone means to be "more than a mere inactive companion"; (internal quotation marks omitted) *State* v. *Harris*, 32 Conn. App. 831, 841, 632 A.2d 50 (1993), appeal dismissed, 230 Conn. 347, 644 A.2d 911 (1994); but "to do something purposely" in order to "support, help, assist or strengthen" them. (Internal quotation marks omitted.) Id., 841 n.10. Although accessorial liability for an assault cannot be based solely on a person's presence at the scene, if there is evidence that the person was not merely a witness but also participated in the assault, a reasonable inference may be drawn that the participation aided the principal assailant by, for example, preventing the victim from more easily escaping the fight or by making the victim more vulnerable to the principal assailant's assault. See *State* v. *Raynor*, 175 Conn. App. 409, 431, 167 A.3d 1076 (in challenge by defendant to sufficiency of evidence supporting conviction of first degree assault as accessory, court concluded jury reasonably could have inferred from evidence of defendant's presence at brawl with gun and participation in physical beating of victim prior to his shooting that defendant aided principal by preventing victim from leaving area and helping immobile victim before he was shot), cert. granted on other grounds, 327 Conn. 969, 173 A.3d 952 (2017).

Although it is indisputable that a defendant could not be punished for acting as both a principal and accessory in the commission of a single criminal act, the prohibition against double jeopardy is not always automatically violated simply because of contemporaneous convictions of the same offense as both a principal and as an accessory. If, for example, a jury reasonably could find on the basis of the evidence presented that each charged offense was the result of a distinct act of independent legal significance—one committed as a principal and another as an accessory—double jeopardy is not implicated. Because the defendant in the present case was convicted on separate counts of assaulting each of the victims both as a principal and as an accessory, we look to the evidence and the state's theory of the case

to determine whether the jury could have reasonably concluded that separate acts underlie each conviction or whether the defendant is being twice punished for the same act.

A

We first consider whether, with respect to the convictions arising out of the stabbing injuries to Rodriguez, the defendant has demonstrated that the jury could not reasonably have concluded that two distinct acts of criminal conduct were committed that would support its findings of guilt on separate counts alleging first degree assault as a principal and first degree assault as an accessory. We conclude that the defendant has failed to meet this burden.

The evidence at trial reasonably can be construed as establishing at least three separate stabbing incidents involving Rodriguez. First, during the fracas that ensued after Rodriguez intervened to stop the altercation between the defendant and Medina, the defendant stabbed Rodriguez. Second, Eliezer, who also was armed with a knife, then stabbed Rodriguez in the back. Third, after Rodriguez tried to leave the initial skirmish, the defendant pursued Rodriguez into the street and stabbed him again.

The jury, thus, reasonably could have predicated its finding that the defendant committed assault in the first degree as a principal either on the basis of the first or third of these stabbing incidents, each of which was completed by the defendant himself. Even if the defendant were able to convince us that the relatively simultaneous stabbings of Rodriguez by the defendant and Eliezer during the initial outbreak of violence should be treated a single act for purposes of double jeopardy, an argument that we reject for reasons we discuss in addressing the injuries to Tucker, there is no doubt that the subsequent stabbing of Rodriguez by the defendant that occurred after Rodriguez left the initial brawl was a criminal act distinct and separate from the stabbings initially inflicted on Rodriguez by the defendant and his brother.

Furthermore, the jury's finding that the defendant engaged in an assault in the first degree as an accessory could have been predicated on his having aided Eliezer in the second act of stabbing Rodriguez. The jury reasonably could have concluded that the defendant aided and encouraged Eliezer's assault of Rodriguez in any number of ways, including by helping Eliezer to arm himself with a knife and through his own participation in the fight, making it easier for Eliezer to wound Rodriguez.[6] See id. (defendant's participation in fight evinces intent to aid perpetrator in assault and supports jury's finding of accessorial liability).

Moreover, as we previously stated, we consider the state's theory of the case in our analysis of whether the

alleged transaction logically can encompass separate acts. See *State* v. *Porter*, supra, 328 Conn. 661. To the extent that the defendant contends that the state presented the two charges of assault in the first degree as a principal and an accessory as alternative theories of liability, we reject that claim. The state argued that both victims were stabbed multiple times and presented evidence of both assailants stabbing each victim. The state also argued that the evidence supported a finding that the defendant acted as an accessory "just by being there with the knife himself." From the very beginning of trial, the information contained four separate and distinct counts for each charge. At no time did the state suggest to the jury that the charges were alternative theories of liability. Furthermore, the court's jury instruction regarding the four charges reiterated that each charge was separate and distinct, rather than charges in the alternative. Although the trial court did not specifically articulate that the jury could deliver a guilty verdict as to each of the charges, it did not preclude the jury from making such a finding. See *State* v. *King*, 321 Conn. 135, 154, 136 A.3d 1210 (2016) ("[a]lthough . . . the trial court never explicitly informed the jury that it could deliver a guilty verdict on both charges, it also never instructed the jury that it could find the defendant guilty only on one charge but not the other").

In sum, we conclude with respect to the injuries inflicted on Rodriguez that the acts of stabbing were susceptible of separation into distinct criminal acts for which the defendant could be punished without offending principles of double jeopardy. See *State* v. *Brown*, supra, 299 Conn. 654. Furthermore, such theory comports with the state's theory presented at trial. The defendant has presented no legal precedent that would compel an opposite conclusion. Accordingly, we reject the defendant's claim that his conviction of assault in the first degree as an accessory, as charged in count three of the information, should have been vacated by the trial court because it violated double jeopardy principles.

### B

We turn next to the evidence pertaining to the stabbing injuries inflicted on Tucker, which we acknowledge presents a closer case from a double jeopardy perspective than the assault on Rodriguez because, unlike Rodriguez, all three stabs inflicted on Tucker occurred closer in both proximity and time. Nevertheless, on the basis of our review of the available evidence, we conclude that the jury reasonably could have determined that the defendant was guilty both as a principal actor for the stab or stabs that he personally inflicted on Tucker and as an accessorial actor for intentionally aiding the nearly simultaneous stab or stabs that Eliezer directly inflicted on Tucker.

The defendant argues that if he had acted alone, he could not have been convicted of separate counts of assault on Tucker on the basis of each individual stab that he inflicted during the short duration of the fight, and that the same rationale should bar his conviction for multiple stabs that were inflicted by himself and by an accomplice. In making this argument, the defendant relies on this court's decision in *State* v. *Nixon*, 92 Conn. App. 586, 597, 886 A.2d 475 (2005), in which we held that the conviction of two counts of assault in the second degree arising out of multiple stab wounds inflicted on a single victim during a continuous and uninterrupted attack violated the prohibition against double jeopardy. *Nixon* did not address, however, the scenario at issue here, in which more than one perpetrator each assaulted a victim within close proximity in time and space. We conclude that *Nixon* is not applicable to the scenario presented in the present case.

The defendant argues that *Nixon* is still controlling despite the fact that it involved only one criminal perpetrator. He does so by relying on the notion that courts generally make no legal distinction between accessorial liability and liability as a principal. See *State* v. *Gamble*, 119 Conn. App. 287, 297, 987 A.2d 1049, cert. denied, 295 Conn. 915, 950 A.2d 867 (2010). From that doctrinal basis, he asserts that the presence of multiple assailants should have no effect on the application of *Nixon*. This argument, however, fails to recognize that multiple convictions for the same crime are permitted if they are based on distinct acts that may be performed by more than one person rather than the type of rapid succession of multiple blows by a single perpetrator, on which *Nixon* was decided.

It is particularly noteworthy that the defendant does not argue that double jeopardy bars his conviction as a principal for the stabbing of Tucker and as an accessory to the stabbing of Rodriguez, despite those stabbings also having quickly occurred within the context of the same melee. The defendant thus seems tacitly to acknowledge that he properly may be held criminally liable for the actions of his accomplice against a separate victim. It would be illogical to conclude that he would not be liable to the same degree simply on the happenstance that his accomplice targets the same victim that he himself has just assaulted or is simultaneously assaulting. In short, we find the defendant's argument, which is based on his interpretation and conflation of *Nixon* and *Gamble*, unpersuasive.

This court having resolved that argument, the evidence before the jury was that Tucker was stabbed multiple times during the initial fray. There was evidence that both the defendant and Eliezer were armed with knives. The jury was free to resolve conflicting evidence by concluding that Tucker's injuries were not inflicted by a single assailant, and that both the defen-

dant and Eliezer stabbed Tucker. Under such a scenario, the jury reasonably could have found the defendant liable for assault in the first degree on the basis of his own stabbing of Tucker. Moreover, as it did with Rodriguez, the jury also could have found the defendant liable as an accessory for Eliezer's stabbing of Tucker, a contemporaneous yet separate assault with independent legal significance because the defendant engaged in conduct with the intent to aid Eliezer's assault.[7] In sum, because the defendant's multiple punishments for assault as to each victim were premised not on a single criminal act but distinct repetitions of the same crime, the court was not constitutionally required to vacate his conviction of two counts of assault in the first degree as an accessory. Because the defendant has not demonstrated that a double jeopardy violation exists, he cannot prevail under the third prong of *Golding*.

## II

The defendant next claims that the court improperly instructed the jury on attempted murder and consequently deprived him of a fair trial. The defendant contends that the court's instructions on attempted murder improperly permitted the jury to find him guilty if it found that he had the general intent to fight with a knife without also finding that he had the specific intent to cause death. Specifically, the defendant argues that the court misled the jury by utilizing the phrase "engaged in anything" in three instances, reading the full statutory definition of general and specific intent, and failing to adequately define the substantial step element.

The defendant acknowledges that he did not file a request to charge on attempted murder. Furthermore, the defendant did not take exception to the trial court's instructions as given. Nevertheless, the defendant argues that the unpreserved claim of instructional error is reviewable under *Golding* because it implicates his constitutional right to have the jury properly instructed on all elements of an offense and the record is adequate for review. See part I of this opinion. The state does not dispute that the first two prongs of *Golding* have been satisfied with respect to this claim, and the state did not assert a waiver pursuant to *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011). We agree because the record is adequate for review, and, when intent is an element of a crime, a trial court's failure to instruct the jury properly with respect to intent implicates the due process rights of the accused. See, e.g., *State* v. *DeJesus*, 260 Conn. 466, 472–73, 797 A.2d 1101 (2002). We conclude, however, that the defendant cannot prevail under *Golding*'s third prong.

"Our standard of review for claims of instructional impropriety is well established. The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which they might find to be established . . . . When reviewing [a] challenged jury

instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety . . . and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party . . . . In this inquiry we focus on the substance of the charge rather than the form of what was said not only in light of the entire charge, but also within the context of the entire trial. . . . Moreover, as to unpreserved claims of constitutional error in jury instructions, we have stated that under the third prong of *Golding*, [a] defendant may prevail . . . only if . . . it is reasonably possible that the jury was misled . . . ." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 179, 920 A.2d 236 (2007). "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 452–53, 988 A.2d 167 (2009).

It is well established that the charge of attempted murder requires the state to prove beyond a reasonable doubt that the defendant had the specific intent to cause the death of another person.[8] *State* v. *Griggs*, 288 Conn. 116, 130–31, 951 A.2d 531 (2008). We turn to a review of the challenged jury instruction to determine whether it is reasonably possible that the jury was misled.

The trial court instructed the jury on intent as follows: "The question of intent: Intent relates to the condition of the mind of the person who commits the act, his or her purpose in doing it. The law recognizes two types of intent; general intent and specific intent, but each of the crimes charged here are crimes of specific intent, so you do not need to concern yourself with what general intent means.

"Specific intent is the intent to achieve a specific result. A person acts intentionally, with respect to a result, when his or her conscious objective is to cause such result. What the defendant intended is a question of fact for you to determine.

"A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his conscious objective is to cause such a result or . . . *engage in such conduct*.

"In this case, you will note that there is in each count an element which requires you to find that the state has proven beyond a reasonable doubt that . . . the defendant had the specific intent to do the thing charged. . . .

"The evidence of intent: What a person's intention was is usually a matter to be determined by inference. No person is able to testify that he or she looked into another's mind and saw therein certain knowledge or a certain purpose or intention to do harm to another.

"Because direct evidence of the . . . defendant's state of mind is rarely available, intent is generally proved by circumstantial evidence. The only way a jury can ordinarily determine what a person's intention was, at any give[n] time, is by determining what the person's conduct was and what the circumstances were surrounding that conduct and from that infer what his or her intention was." (Emphasis added.)

The defendant claims that the court erred in using the phrase "engage in anything" when it read the attempt statute to the jury. The court instructed the jury as follows: "The defendant is charged with two counts of attempt to commit murder.

"The mental state required for the commission of the crime of murder is that the defendant specifically intended to cause the death of another person.

"The statute defining attempt reads in pertinent part as follows: A person is guilty of an attempt to commit a crime if, acting with the mental state required for the commission of the crime, he intentionally *engaged in anything*, which, under the circumstances, as he believed them to be, was an act constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt: Element number one, intent . . . the first element is that the defendant had the kind of mental intent required for the commission of the crime of murder. The mental state required for the commission of murder is that the defendant specifically intended to cause the death of another person. There is no particular length of time necessary for the defendant to have formed the specific intent to kill. And, a person acts intentionally with respect to a result, when his conscious objective is to cause such a result." (Emphasis added.)

In defining the second element of attempt, the court instructed the jury using the contested language as follows: "Element number two . . . the second element is that the defendant intentionally *engaged in anything*, which, under the circumstances, as he believed them to be, was an act constituting a substantial step in a

course of conduct planned to culminate in his commission of the crime. In other words, the state must prove both intent and conduct beyond a reasonable doubt to obtain a conviction." (Emphasis added.) Finally, the court summarized the elements utilizing the "engaged in" phrase as follows: "So, to sum up, the charge of attempt to commit murder, the state has to prove beyond a reasonable doubt that the defendant had the necessary . . . intent to commit the crime and that he intentionally *engaged in anything* which constituted a substantial step in the course of conduct planned to culminate in his commission of the crime under the circumstances, as he believed them to be." (Emphasis added.)

On appeal, the defendant claims that the court improperly comingled the language from both sections of the attempt statute by utilizing the phrase "engaged in" and not the phrase "did or omitted doing" from the other subsection of the attempt statute. In the challenged jury instruction, the court utilized the "engaged in anything" language, which the defendant claims is related to the impermissible definition of general intent found in § 53a-3 (11). In addition, the defendant claims that the trial court's recitation of the full definition of intent in § 53a-3 (11) misled the jury. We disagree.

"It is axiomatic that the definition of intent as provided in § 53a-3 (11)[9] embraces both the specific intent to cause a result and the general intent to engage in proscribed conduct. It has become axiomatic, through decisional law, that it is improper for a court to refer in its instruction to the entire definitional language of § 53a-3 (11), including the intent to engage in conduct, when the charge relates to a crime requiring only the intent to cause a specific result." (Footnote added.) *State* v. *Sivak*, 84 Conn. App. 105, 110–11, 852 A.2d 812, cert. denied, 271 Conn. 916, 859 A.2d 573 (2004). In *State* v. *Rivet*, 99 Conn. App. 230, 232–33, 912 A.2d 1103, cert. denied, 281 Conn. 923, 918 A.2d 274 (2007), this court stated: "[I]n cases in which the entire definition of intent was improperly read to the jury, the conviction of the crime requiring specific intent almost always has been upheld because a proper intent instruction was also given. The erroneous instruction, therefore, was not harmful beyond a reasonable doubt [in those cases]." (Internal quotation marks omitted.) Compare *State* v. *Austin*, 244 Conn. 226, 236, 710 A.2d 732 (1998) (no reversible error when improper intent instruction followed by numerous proper instructions on elements of murder), and *Moody* v. *Commissioner of Correction*, 127 Conn. App. 293, 306, 14 A.3d 408 (no reversible error when improper intent instruction followed by repetition of specific intent element of murder and assault), cert. denied, 300 Conn. 943, 17 A.3d 478 (2011), with *State* v. *Lopes*, 78 Conn. App. 264, 271–72, 826 A.2d 1238 (reversible error when improper intent instruction given directly in regard to elements of attempt to com-

mit murder and not followed by numerous proper instructions), cert. denied, 266 Conn. 902, 832 A.2d 66 (2003), and *State* v. *DeBarros*, 58 Conn. App. 673, 683, 755 A.2d 303 (reversible error when improper intent instruction not only given in initial and two supplemental charges but also referred to seven additional times), cert. denied, 254 Conn. 931, 761 A.2d 756 (2000).

The defendant contends that the attempt instruction failed to guide the jury on what constituted a substantial step, and the omission of the language found in the model jury instruction on the Judicial Branch website,[10] coupled with the other improper instructions, seriously misled the jurors because it allowed them to find the defendant guilty of attempted murder on the basis of his act of fighting with a knife, without determining his true purpose. The state argues that the model jury instruction language was not necessary in guiding the jury, and that the instructions that the court gave properly required it to find that the defendant intended to cause death and whether he intentionally engaged in conduct that constituted a substantial step planned to culminate in his commission of murder. We agree with the state.

After reviewing the instructions in their entirety, we are persuaded that the instructions adequately conveyed to the jury that to find the defendant guilty of attempted murder, the jury must find that he had the specific intent to cause death. Although the court gave the full definition of intent as provided in § 53a-3 (11) and used the phrase, "engage in anything," at three points in the charge, our review of the entire instruction reveals that it is not reasonably possible that the instructions misled the jury. The words, "engaged in anything," as used by the trial court in the charge on attempt to commit murder did not affect the specific intent requirement; rather, the language referred to conduct constituting a substantial step toward the commission of the crime. See *State* v. *Pires*, 122 Conn. App. 729, 745, 2 A.3d 914 (2010) ("the words 'engage in conduct' refer not to the required intent but rather explain that the person being aided by the accessory must be doing the action that constitutes the crime, as opposed to simply thinking about the criminal act or perhaps engaging in conduct other than the criminal act"), aff'd, 310 Conn. 222, 77 A.3d 87 (2013).

Indeed, the trial court repeatedly told the jury that, in order to find the defendant guilty, it must find that he had the specific intent to cause death[11] and explained that the jury "[did] not need to concern [itself] with what general intent means." The court instructed the jury twice that "[t]he mental state required for the commission of murder is that the defendant specifically intended to cause the death of another person." Moreover, the court instructed that "a person acts intentionally with respect to a result when his conscious

objective is to cause such result." Additionally, to the extent that the defendant claims that the separate claims of error taken together deprived him of a fair trial, we note that our Supreme Court has rejected the cumulative error approach regarding claims of instructional error. *State* v. *Tillman*, 220 Conn. 487, 505, 600 A.2d 738 (1991) ("[w]e decline to create a new constitutional claim in which the totality of alleged constitutional error is greater than the sum of its parts"), cert. denied, 505 U.S. 1207, 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992).

Viewing the instructions as a whole, we conclude that the defendant cannot prevail on his claim of instructional impropriety with regard to his conviction of attempted murder. Accordingly, the defendant's claim fails to satisfy the third prong of *Golding*, as he has not established the existence of a constitutional violation that deprived him of a fair trial.

III

The defendant also claims that the court misled the jury by instructing the jurors on the defenses of self-defense and defense of others, as well as on the lesser included offenses of assault in the second degree and assault in the third degree. More specifically, the defendant claims that the court committed reversible error because its instructions on self-defense permitted the jury to consider lesser included offenses if the state failed to disprove self-defense beyond a reasonable doubt. We disagree.

The defendant failed to preserve this claim at trial and now seeks *Golding* review. See part I of this opinion. Unlike the prior claim of instructional error, however, the state argues that the defendant waived this claim, pursuant to *State* v. *Kitchens*, supra, 299 Conn. 482–83, and, thus, is not entitled to review under *Golding*. We agree.

The following facts are necessary for the resolution of this claim. The trial court provided a thirty-one page draft of the proposed jury instructions to the defendant and the state prior to the charging conference on July 29, 2015. Although the record does not identify the exact date that the parties received the draft, the record is clear that the parties had the draft overnight from July 29 to July 30, 2015. During the charging conference the court discussed with counsel how to guide the jury regarding the consideration of the numerous charges and the lesser included offenses. The court's proposed instructions included explaining to the jury that it is the jury's choice as to what order it deliberates the charges, except for the lesser included offenses, and the court, during the charging conference, specifically stated to the parties, "I am going to ask you to review that, particularly." The court also discussed with counsel the instructions on defense of others and self-

defense. The court stated that "[t]he self-defense and defense of others, the draft . . . proposed by [the state] . . . is tracked by the recommendation of the proposed charges filed by the defense." The discussion included a suggestion about whether the court should utilize "and/or," or, "or," or, "and," in its instruction. The defense suggested "and/or" and did not raise any exceptions to the charge as proposed. At the end of the charging conference, the court specifically addressed the self-defense charge and inquired as to whether the evidence indicated that the defendant attacked in defense of another person.

The record indicates that the following morning, the trial court gave a revised copy of the charge to counsel and stated that "counsel and I had a charging conference here in this courtroom, and I had promised that I would give to each attorney a copy of a revised charge, following our discussions . . . . While the charges remain very much the same in . . . substance, as the ones that I previously presented to defense counsel and the state, there have been some amendments and alterations, and, obviously I will give you, each of you, more time to consider the charges that I've proposed to the jury, if you wish to do that. I anticipate that you will take most of the morning to do the arguments; however, you will have the luncheon recess and as much time thereafter as you wish to review the charges." The court then reviewed the proposed changes with counsel on the record. The court reviewed how to guide the jury to consider the numerous charges and the lesser included offenses. stating: "I've suggested effectively that they should start on . . . count five, go through that, consider whether the elements are . . . proven; if they find that is the case, consider whether the defense [of] self-defense applies and then continue. In relation to the . . . other charges, I've added that they must consider or can consider lesser included offenses. So, I would appreciate it if . . . you let me know if you need any time on that." The jury was subsequently brought into the court, and the parties conducted closing arguments.

After the jury was dismissed for the luncheon recess, the defense expressed an issue with one of the state's comments in the closing argument and requested a curative instruction. After the luncheon recess, the parties confirmed that they had no other concerns regarding the revised instructions, and the court discussed the curative instruction requested by defense counsel. The jury was summoned into the courtroom, and the court read the instructions to the jury. The court specifically asked if the parties had any exceptions to the charge, and defense counsel specifically stated, "I don't have any exceptions."

"It is well established in Connecticut that unpreserved claims of improper jury instructions are review-

able under *Golding* unless they have been induced or implicitly waived. . . . The mechanism by which a right may be waived . . . varies according to the right at stake. . . . For certain fundamental rights, the defendant must personally make an informed waiver. . . . For other rights, however, waiver may be affected by action of counsel . . . [including] the right of a defendant to proper jury instructions. . . . Connecticut courts have consistently held that when a party fails to raise in the trial court the constitutional claim presented on appeal and affirmatively acquiesces to the trial court's order, that party waives any such claim [under *Golding*]. . . . [W]hen the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. . . . [C]ounsel's discussion of unrelated parts of the jury charge at an on-the-record charge conference . . . demonstrate[s] that counsel was sufficiently familiar with the instructions to identify those portions of the instructions with which [she] disagreed. [T]o the extent that [she] selectively discussed certain portions of the instructions but not others, one may presume that [she] had knowledge of the portions that [she] did not discuss and found them to be proper, thus waiving the defendant's right to challenge them on direct appeal. . . . Our Supreme Court has stated that it is sufficient to show that defense counsel had a meaningful opportunity to review the proposed instructions if she was given the opportunity to review them overnight." (Citations omitted; internal quotation marks omitted.) *State* v. *Hall-Davis*, 177 Conn. App. 211, 240–41, 172 A.3d 222, cert. denied, 327 Conn. 987, 175 A.3d 43 (2017); see also *State* v. *Kitchens*, supra, 299 Conn. 482–83.

Here, the defendant had a meaningful opportunity to review the proposed jury instructions at issue and assented to the instructions. The defendant had the proposed instructions overnight on July 29, 2015, and discussed the challenged instructions at length with the court at the charging conference and in the morning after the charging conference on July 30, 2015. The court reviewed the revisions with counsel and specifically requested that the parties review the revisions related to the instructions challenged on appeal. The defendant expressed no concerns regarding the revisions or the charge as given to the jury.

Accordingly, we conclude that, under the present circumstances, the defendant had a meaningful opportunity to review the jury instruction challenged on appeal and waived his right to challenge the instruction on appeal.

Alternatively, the defendant argues that this court should review his waived claim under the plain error doctrine. In *State* v. *McClain*, 324 Conn. 802, 812–15, 155 A.3d 209 (2017), our Supreme Court held that a *Kitchens* waiver does not preclude appellate relief under the plain error doctrine. See *State* v. *Torres*, 325 Conn. 919, 163 A.3d 618 (2017). Accordingly, we review whether the defendant's claim of instructional impropriety constitutes plain error requiring reversal of the judgment.

A review of the record reveals the following additional relevant facts. The trial court instructed the jury on the defense of self-defense and defense of others as follows: "The evidence in this case raises the issues of self-defense . . . and/or the defense of others. Self-defense and/or the defense of others, applies to all of the charges before you, as well as to lesser included offenses of assault in the second degree, assault in the third degree. . . . After you've considered all of the evidence in this case, if you find that the state has proven beyond a reasonable doubt each element of the crime, you must go on to consider whether or not the defendant acted in self-defense or defense of others. In this case, you must consider self-defense or defense of others in connection with—with each count of the information and the lesser included offenses you may consider." Later in the charge, the court repeated the instructions as to self-defense and suggested a way for the jury to consider the charges.

Following the repetition of the self-defense and defense of others instruction, the court instructed: "If . . . you . . . find that the state has not . . . disproved beyond a reasonable doubt at least one of the elements of the defense or has not proven one of the statutory disqualifications, then on the strength of that defense alone, you must find the defendant not guilty, despite the fact that you have found the elements of the crime proved beyond a reasonable doubt." The court continued to summarize an example for how to consider the lesser charges: "In other words, you consider, for example, assault in the first degree, only if you acquit the defendant of that charge, either because you do not find the state has proven the elements of that charge beyond a reasonable doubt or you find the state has failed to . . . disprove . . . the defenses of self-defense and/or defense of others, and so that you acquit the defendant on that charge, then you may consider assault in the second degree; you're going to go through the same analysis for that lesser included offense, if you acquit the defendant of that charge . . . you then shall consider the charge of assault in the third degree."

The next day, the court reinstructed the jury about how to deliberate and stated that "while I anticipate that [your] findings in relation to self-defense and/or the defense of others, will probably be the same in both

the substantive and the lesser included offenses, you must include . . . that issue in your consideration of each charge, if appropriate."

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record. Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [T]he plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . [Previously], we described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . .

"It is axiomatic that, [t]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . Put another way, plain error review is reserved for only the most egregious errors. When an error of such a magnitude exists, it necessitates reversal." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *McClain*, supra, 324 Conn. 812–14.

The defendant claims that by its instructions, the court expressly precluded the jury from considering the defenses of defense of others and self-defense. The defendant cites *State* v. *Hinckley*, 198 Conn. 77, 87–88, 502 A.2d 388 (1985), and argues that the trial court's error was "an example of an extraordinary [situation] where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings."[12] The defendant also argues that it was plain error for the trial court to misstate the effect of the governing statute by telling the jurors that acquittal on the basis of self-defense was not a true acquittal.[13] The state argues that it is not reasonably possible that the instruction misled the jury,

and that any error did not result in manifest injustice and is harmless beyond a reasonable doubt because the defendant was convicted of the charged offenses. We agree with the state.

Even if we assume arguendo that the instruction constituted obvious and undebatable error, the record does not demonstrate manifest injustice and therefore does not satisfy the second prong required for reversal of the judgment pursuant to the plain error doctrine. See *State* v. *Blaine*, 179 Conn. App. 499, 510, 180 A.3d 622, cert. granted on other grounds, 328 Conn. 917, 181 A.3d 566 (2018). "Because [a] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice . . . under the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly unjust." (Citation omitted; internal quotation marks omitted.) *State* v. *Coward*, 292 Conn. 296, 307, 972 A.2d 691 (2009).

Because the jury returned a verdict of guilty on the charged offenses and not on any of the lesser included offenses, the defendant cannot establish manifest injustice or fundamental unfairness.[14]

IV

The defendant's final claim is that prosecutorial impropriety deprived him of a fair trial because it negatively impacted his self-defense claim, as well as his claim of third-party culpability. Specifically, the defendant alleges that the prosecutor improperly (1) misstated the law to the jurors; (2) distorted the burden of proof; (3) appealed to the jurors' emotions; and (4) commented on facts not in evidence. With one minor exception, we conclude that the prosecutor's remarks were not improper, and, thus, the defendant was not deprived of a fair trial.

As a preliminary matter, we set forth the general principles under which we review claims of prosecutorial impropriety. "In cases of unpreserved claims of prosecutorial [impropriety] . . . it is unnecessary for the defendant to seek to prevail under the specific requirements of . . . *Golding* and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Bermudez*, 274 Conn. 581, 586–87, 876 A.2d 1162 (2005). Our Supreme Court has articulated that "following a determination that prosecutorial [impropriety] has occurred, regardless of whether it was objected to, an appellate court must apply the [*State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)] factors to the entire trial." *State* v. *Bermudez*, supra, 587. "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the

burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process. . . . In analyzing whether the prosecutor's comments deprived the defendant of a fair trial, we generally determine, first, whether the [prosecutor] committed any impropriety and, second, whether the impropriety or improprieties deprived the defendant of a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Felix R.*, 319 Conn. 1, 8–9, 124 A.3d 871 (2015).

When reviewing the propriety of a prosecutor's statements, "we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) Id., 9. "[Impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] [was harmful and thus] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *James E.*, 154 Conn. App. 795, 816, 112 A.3d 791 (2015).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . [A]s the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 76–77, 43 A.3d 629 (2012).

We address each of the defendant's claims of prosecutorial impropriety in turn.

A

The defendant first asserts that the prosecutor improperly stated that the defendant was the initial aggressor due to his assault of Medina. We are not persuaded.

During closing argument the prosecutor made the following statement: "The first aggressive act was his.

When he first thrust his face into [Medina's]—his hand into [Medina's] face, he started [the] brawl. Many witnesses described it as pushing her face, some of them described it as punching her. Now, he was the catalyst of the whole event, once he was the first to take physical action against her. . . . The state's point of view is that [the] original act of aggression, by the defendant, caused a chain of events, which resulted in these stabbings. And, now he comes before you and he's, sort of, just making the argument that he has the right to use deadly force, in a situation that he caused to occur; it doesn't seem to be reasonable, and I'm arguing that he was the initial aggressor."

Although "prosecutors are not permitted to misstate the law . . . because such statements are likely to improperly mislead the jury"; (citations omitted) *State* v. *Otto*, supra, 305 Conn. 77; the prosecutor, however, may argue the state's case forcefully, provided that the argument is fair, and based on the facts in evidence and reasonable inferences drawn from that evidence. *State* v. *Bardliving*, 109 Conn. App. 238, 253, 951 A.2d 615, cert. denied, 289 Conn. 924, 958 A.2d 153 (2008).

The defendant fails to cite any law that supports his claim that the prosecutor's argument was improper.[15] The defendant claims that he could be the initial aggressor only if he was the first person to threaten or use force against Tucker or Rodriguez and thus the prosecutor's argument that he could be an initial aggressor from his actions toward Medina was a misstatement of the law.

At trial, the court instructed the jury regarding the state's burden to prove that the defendant was the initial aggressor in the encounter with Rodriguez and Tucker.[16] The state claims that the arguments at trial centered around when the encounter began and that the defendant's argument in closing arguments to the jury was that Eliezer was the initial aggressor when he confronted Mendez. The state claims that its argument was proper because "if a jury reasonably can find that a defendant began a brawl by attacking one person, he cannot claim that he was not the initial aggressor with respect to other people swept into the brawl in defense of that person." We agree with the state.

In the absence of any law to the contrary, the prosecutor's argument that the defendant was the initial aggressor was based on the facts in evidence and thus, was not improper. The defendant has failed to establish that the prosecutor's remarks were improper, let alone establish that such statements were so egregious that they amounted to a denial of due process.

B

The defendant's next claim of prosecutorial impropriety is that the prosecutor distorted the burden of proof in his closing argument by suggesting to the jury that

a defendant has the burden to produce evidence in support of his defense. In addition, the defendant claims that the prosecutor's argument violated our Supreme Court's holding in *State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000). We disagree.

"In *Malave*, our Supreme Court abandoned the rule enunciated in *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960), which had permitted trial courts to instruct the jury that [t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause. . . . Although the [c]ourt in *Malave* abandoned the *Secondino* rule, it did not prohibit counsel from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case. . . . The court did, however, prohibit counsel from directly urging the jury to draw an adverse inference by virtue of the witness' absence. . . . Additionally, the court stated that [f]airness, however, dictates that a party who intends to comment on the opposing party's failure to call a certain witness must so notify the court and the opposing party in advance of closing arguments. Advance notice of such comment is necessary because comment on the opposing party's failure to call a particular witness would be improper if that witness were unavailable due to death, disappearance or otherwise. That notice will ensure that an opposing party is afforded a fair opportunity to challenge the propriety of the missing witness comment in light of the particular circumstances and factual record of the case." (Internal quotation marks omitted.) *State* v. *Grant*, 154 Conn. App. 293, 325–26, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015).

Defense counsel argued during her closing argument that Eliezer was the initial aggressor when he confronted Mendez: "That's the initial aggressor, not [the defendant]; the initial aggressor in this case was Eliezer, Eliezer coming over and confronting, leaving his car and coming over to where the girls were and confronting either all the girls or [Mendez]. He's the initial aggressor." During his rebuttal, the prosecutor stated: "You know, there was some talk about the initial aggressor, that Eliezer was the initial aggressor; there is no testimony in this case that Eliezer ever struck [Mendez], from no witness, anywhere. And, you remember [the defendant's] own expert testified yesterday, that words are okay, words don't require defense or force. So, that altercation between Eliezer and [Mendez] was not a physical altercation, so he couldn't be the initial aggressor. The first one to be the initial aggressor is the one to use force . . . . A lot of stuff or testimony or evidence was attributed to Eliezer in this case and what

he may have been doing or thinking. *He never testified in this case. I don't know that all the evidence attributed to Eliezer during the rebuttal actually has a basis in the facts.*" (Emphasis added.)

The state argues that *Malave* does not apply because the prosecutor did not make a missing witness argument and the prosecutor properly focused the jury on a weakness in the defendant's theory of the case. The state contends that the prosecutor properly responded to the defendant's argument that Eliezer had been the initial aggressor by pointing out the absence of evidence that Eliezer had engaged in anything other than a verbal altercation with Mendez.

Under the present circumstances, we conclude that the prosecutor did not directly urge the jury to draw an adverse inference by virtue of Eliezer's absence, thereby distorting the burden of proof, but argued instead that there was no evidence to support defense counsel's claim that Eliezer was the initial aggressor. See *State* v. *Andrews*, 313 Conn. 266, 307, 96 A.3d 1199 (2014) (holding that prosecutor's comment, "[t]hey have access to the state forensic lab, they can put on witnesses if they want to from the lab," was not improper missing witness argument because prosecutor argued no evidence supported defendant's claim [emphasis omitted]). In *Malave*, our Supreme Court held that "we do not prohibit counsel from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case. . . . [Such comment is allowed as] long as counsel does not directly exhort the jury to draw an adverse inference by virtue of the witness' absence . . . ." *State* v. *Malave*, supra, 250 Conn. 739. Accordingly, the prosecutor's reference during rebuttal argument to the lack of evidence for the defendant's theory of the case, i.e., that Eliezer was the initial aggressor, was not improper.

C

The defendant also claims that the prosecutor improperly appealed to the emotions of the jurors by referring to Tucker and Rodriguez as "good Samaritans." We disagree. In closing arguments, the prosecutor stated that Tucker and Rodriguez "had the right to come to [Medina's] aid, they were merely defending a third person, they merely used physical force, not deadly force, they were acting as good Samaritans." The prosecutor then stated that Rodriguez "was a good Samaritan" and then asked the jury: "Isn't that what you want to see in a young man?"

"It has long been held that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to

a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Nonetheless, closing arguments often have a rough and tumble quality about them, [and] some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Patterson*, 170 Conn. App. 768, 794, 156 A.3d 66, cert. denied, 325 Conn. 910, 158 A.3d 320 (2017).

Here, the prosecutor's comments were based on reasonable inferences from facts in evidence and did not invite the jury to decide the case on the basis of sympathy for Rodriguez and Tucker. The prosecutor utilized his opportunity in closing arguments to explain the motivations of Rodriguez and Tucker for approaching the defendant and further argued that the defendant was the initial aggressor. Accordingly, we conclude that the prosecutor's comments referring to the victims as "good Samaritans" were not improper.

### D

The defendant's final claim is that on three occasions the prosecutor made arguments that were based on facts not in evidence to suggest that the defendant stabbed Tucker. We do not agree.

Before turning to a discussion of each of the alleged improprieties, we first set forth the applicable law. "[T]he prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek[s] impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence [over] jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules [that] the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury

ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *James E.*, supra, 154 Conn. App. 817.

"In fulfilling his duties, a prosecutor must confine the arguments to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony that is not the subject of proper closing argument. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Internal quotation marks omitted.) *State* v. *Patterson*, supra, 170 Conn. App. 789.

1

The defendant first contends that, during closing argument, the prosecutor improperly argued that two witnesses, Mendez and Adames, saw the defendant stab Tucker, but the facts in evidence did not support that statement. Specifically, the prosecutor argued: "[Mendez]: Eliezer started giving her a hard time. A lot of the women that were in that group say it was Eliezer that started first to be aggressive, verbally. [The defendant] mushed her in the face and had her in a headlock. [The defendant] struck [Medina] and she was two feet away. She signed three statements that night, indicating that [the defendant] stabbed [Tucker]. She can confirm that [the defendant] stabbed [Tucker]. You can listen to the testimony of witnesses; her testimony was short, give a listen to her testimony if you so desire. It was very crisp and, sort of, very confidently stated about what she knows.

"[Adames]: It started with Eliezer and [Mendez]. She was present at the scene. She knows [Tucker] and [the defendant], signed three statements that very night identifying [the defendant] as the person who . . . stabbed [Tucker], that very night. . . .

"In court, she said she did not see the stabbing; however, she's right there. She would know what occurred. These girls know what occurred here."

Additionally, on rebuttal, the prosecutor read from Adames' testimony and stated: "So, there is some evidence, in which you can infer that [the defendant] stabbed [Tucker]."

The defendant argues that this argument was improper because there was no evidence in the record about the content of Mendez' three signed statements and no evidence that Mendez saw the defendant stab Tucker. Further, the defendant argues that the prosecutor improperly argued that Adames knew what happened, when she explicitly denied seeing anything. In response, the state argues that the prosecutor properly summarized the testimony of each witness. The state further argues that the prosecutor presented fair inferences that could be drawn from Adames and Mendez' testimony.

We look to the testimony to determine whether the prosecutor properly referred to facts in evidence. At trial, Mendez testified that she provided three signed statements to the police in which she described what she observed on the night of the altercation.[17] Mendez also provided the following testimony about what she saw when the defendant and Tucker interacted during the fight: "I saw quick contact, I'm not able to say that I saw the knife in [the defendant's] hand, but I did see, like, because we were, like, two feet away from each other, and then [Tucker] picked up his pants to, like, square up to fight, and [the defendant] came quick (demonstrating), boom, but I didn't see anything in his hand because it was so fast. . . . I don't think he really felt it, until afterward and that's when he said, sis, I think, he's stabbing me, and then I picked up his sweater and then I saw the blood . . . ." When asked if she saw the defendant with a knife, Mendez responded, "I didn't see him with it in his hand, but I can confirm that it was for sure him that stabbed [Tucker] because I was two feet away from him and when I saw this fast movement, that's approximately two minutes later, [Tucker] told me that he got stabbed."

Adames also testified that she had given three statements to the police. Adames acknowledged that in all three of her statements she indicated that the defendant stabbed Tucker. On cross-examination, Adames testified that she did not see the defendant stab Tucker.[18] When the prosecutor inquired on redirect if it was still her position that the defendant stabbed Tucker, she replied, "[y]eah."

A review of the record plainly shows that the prosecutor did not comment on, or suggest an inference from, facts not in evidence, or present matters that the jury had no right to consider. Accordingly, the defendant has failed to establish that the prosecutor's comments were improper.

2

The defendant contends that the prosecutor argued facts not in evidence when he stated: "Junito's brother is Joesenier." The state argues that the comment was made in the context of making an inference drawn from other evidence. We agree with the state.

The prosecutor argued in closing argument: "Liybin Fernandez, Liybin's a tricky witness . . . . Both brothers had knives. Knives were retrieved from the motor vehicle. There's the Junito issue. Listen to the testimony again from Liybin, if you so desire, and ask yourself: did he just get the name inverted? . . . Eliezer, Junito, remember, three of the girls say Eliezer was arguing, they all say Eliezer started the verbal argument. Well, if Eliezer is Junito, it would be accurate for Liybin to say, well, yeah, Eliezer was arguing with the girls. Who stabbed the black individual, he was asked that ques-

tion, he said, Junito's brother. Junito's brother stabbed the black individual, Junito's brother is Joesenier. . . . So, you may want to relisten to his testimony again."

On the basis of our review of the record, there is evidence that could give rise to a reasonable inference that Junito's brother is Joesenier. During Fernandez' testimony, he was asked if Junito was in the courtroom. In response, Fernandez stated, "[t]hat guy looks like him," and identified the defendant. Fernandez also testified, after refreshing his recollection with his prior statement, that "Junito's brother" stabbed Tucker.

Although there is conflicting evidence that Eliezer was also nicknamed Junito,[19] because there is sufficient evidence in the record that could give rise to a reasonable inference that Junito is Eliezer and that, therefore, Junito's brother is the defendant, the prosecutor's statement in his closing argument was proper.

3

The defendant last argues that the prosecutor referred to facts not in evidence when discussing the testimony of two police officers who witnessed the fight and called 911. During rebuttal, the prosecutor stated, "[y]ou know, the indication was that we can rely on the testimony of the trained police officers that saw it. I would argue to you that those trained police officers did not believe that this was a self-defense situation." The defense objected to this portion of the state's closing argument, and the court issued a curative instruction. The state does not contest that the statement was improper, but argues that there is no prejudice from this comment because the defense objected to this portion of the state's closing argument and, after consulting with both parties, the trial court issued a curative instruction.

Even if we assume arguendo that the prosecutor's argument was improper, it is the defendant's burden to establish that the impropriety violated his due process right to a fair trial.[20] See *State* v. *Jones*, 320 Conn. 22, 37, 128 A.3d 431 (2015) ("when a defendant raises on appeal a claim that improper remarks by the prosecutor deprived [him] of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process" [internal quotation marks omitted]). As our Supreme Court has articulated, the "determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [supra, 204 Conn. 540], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument, the severity

of the [impropriety], the frequency of the [impropriety], the centrality of the [impropriety] to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 536–37, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

In applying the *Williams* factors, we determine whether the claimed impropriety, the prosecutor's statement that the trained police officers "did not believe that this was a self-defense situation," violated the defendant's right to a fair trial. On the one hand, there is no indication in the record that the claimed impropriety was invited by either defense counsel or his argument, and the statement directly implicates the issue of self-defense. On the other hand, in light of the remaining *Williams* factors, the defendant's claim must fail. The alleged impropriety occurred during only one portion of the prosecutor's rebuttal and cannot be characterized as frequent. Upon objection by defense counsel, most notably, the court promptly issued a cautionary instruction, which specifically identified the prosecutor's remarks about the police officers' beliefs and stated that there was no evidence to that effect.[21] It is well established that "a prompt cautionary instruction to the jury regarding improper prosecutorial remarks obviates any possible harm to the defendant." *State* v. *Ubaldi*, 190 Conn. 559, 563, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). "In the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Santiago*, 269 Conn. 726, 762, 850 A.2d 199 (2004). The curative instructions make it unlikely that the prosecutor's comments were so prejudicial as to affect the outcome of the trial. Furthermore, pursuant to the final *Williams* factor, the state's case against the defendant was strong, including the testimony of several eyewitnesses describing the assault, and the defendant's statement to the police admitting that he stabbed someone and that he was present at the time of the stabbing. In addition, the evidence included a video of the fight in the parking lot in which several eyewitnesses identified the defendant.

Upon consideration of the *Williams* factors, we conclude that the court's instructions were sufficient to cure any harm to the defendant and, accordingly, that the defendant has failed to establish that the improper comment deprived him of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant was also charged with and found not guilty of an additional count of attempted murder in violation of § 53a-54, and he was convicted of an additional count of conspiracy to commit first degree assault in violation of §§ 53a-59 (a) (1) and 53a-48 that was vacated by the trial court.

[2] The defendant was sentenced to a term of sixteen years of imprisonment

on count one to be served concurrently with counts two through four. As to count six, the defendant was sentenced to six years to serve and five years of special parole, concurrent with count seven and consecutive to counts one through four. The total effective sentence is twenty-two years to serve, followed by five years of special parole.

[3] Count two alleged that the defendant, "with the intent to cause serious physical injury to another person or to a third person by means of a dangerous instrument, to wit: a knife, caused such injury to Luis Rodriguez. This crime occurred on December 1, 2012 at approximately 2:17 a.m. in the vicinity of 45 North Street, Danbury, CT in violation of [§] 53a-59 (a) (1)."

Count three alleged that the defendant, "acting with the mental state required for the offense charged, did solicit or request or command or intentionally aid another person or persons in the assault upon Luis Rodriguez and that during the commission of said assault, Luis Rodriguez suffered serious physical injury with a dangerous instrument, to wit: a knife. This crime occurred on December 1, 2012 at approximately 2:17 a.m. in the vicinity of 45 North Street, Danbury, CT in violation of [§] 53a-8 and § 53a-59 (a) (1)."

[4] Count six alleged that the defendant, "with the intent to cause serious physical injury to another person or to a third person by means of a dangerous instrument, to wit: a knife, caused such injury to Kenneth Tucker. This crime occurred on December 1, 2012 at approximately 2:17 a.m. in the vicinity of 45 North Street, Danbury, CT in violation of [§] 53a-59 (a) (1)."

Count seven alleged that the defendant, "acting with the mental state required for the offense charged, did solicit or request or command or intentionally aid another person or persons in the assault upon Kenneth Tucker and that during the commission of said assault, Kenneth Tucker suffered serious physical injury with a dangerous instrument, to wit: a knife. This crime occurred on December 1, 2012 at approximately 2:17 a.m. in the vicinity of 45 North Street, Danbury, CT in violation of [§] 53a-8 and § 53a-59 (a) (1)."

[5] Although our state constitution does not include a similar double jeopardy provision, our Supreme Court has held that the due process guarantees found in article first, § 8, of the Connecticut constitution embody the protection afforded under the federal constitution. See *State* v. *Michael J.*, 274 Conn. 321, 350–51, 875 A.2d 510 (2005).

[6] We reiterate that the defendant has not argued that there was insufficient evidence to conclude that he acted as an accessory, and, therefore, it is unnecessary for us to marshal all of the evidence that would support the jury's finding of accessorial liability in this case. Furthermore, our resolution of this matter should not be interpreted as holding that the defendant's own act of stabbing Rodriguez would, without more, be sufficient to demonstrate an intention to aid, thereby warranting accessorial liability. Rather, it was the totality of the defendant's actions, including helping to arm Eliezer and his active participation in the brawl, that demonstrate his intent to aid.

[7] As we noted in part I A of this opinion, the state's theory of the case comports with a finding of two separate and distinct charges of assault in the first degree.

[8] General Statutes § 53a-54a (a), defining murder, provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

General Statutes § 53a-49 (a), defining criminal attempt, provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[9] General Statutes § 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."

[10] The defendant claims that the trial court erred by failing to include the following language from the Connecticut Criminal Jury Instructions: "To be a substantial step, the conduct must be strongly corroborative of the defendant's criminal purpose. The act or acts must constitute more than mere preparation. The defendant's conduct must be at least the start of a line of conduct that will lead naturally to the commission of a crime. In other words, it must appear to the defendant that it was at least possible

that the crime could be committed if (he/she) continued on (his/her) course of conduct." (Footnote omitted.) Connecticut Judicial Branch Criminal Jury Instructions 3.2-2, Attempt—§ 53a-49 (a) (2) (element 2) (revised to December 1, 2007), available at https://www.jud.ct.gov/ji/Criminal/Criminal.pdf (last visited September 20, 2018).

[11] As previously stated, the court instructed the jury that "there is in each count an element which requires you to find that the state has proven beyond a reasonable doubt that the . . . defendant had the specific intent to do the thing charged."

[12] The defendant also claims that the court's instructions in response to a jury question about third-party culpability also contributed to the court's error. On the second day of deliberations, the jury had a question on the third-party culpability instructions, and the court discussed with counsel a proposed instruction in response to the question. The court, the state, and defense counsel collaborated and agreed on an appropriate instruction to answer the jury's question. After discussing the instruction off the record, the court went back on the record to state the complete proposed instruction. The defendant and the state assented to the proposed instruction. We reject the defendant's argument, as it has no merit.

[13] As we stated in part II of this opinion, to the extent that the defendant claims the cumulative effect of the instructional improprieties constituted plain error, we reject such an argument. See *State* v. *Tillman* supra, 220 Conn. 505.

[14] Our Supreme Court in *State* v. *Hall*, 213 Conn. 579, 589, 569 A.2d 534 (1990), determined that a defendant was entitled to a jury instruction on self-defense for the lesser included offense of manslaughter in the second degree. There, the trial court had instructed the jury that the defense of self-defense was applicable to only murder and intentional manslaughter in the first degree. Id., 583–84. Our Supreme Court held, however, that even though the trial court failed to give the self-defense instruction for manslaughter in the second degree, it was not reasonably possible that the jury was misled and stated that "the jury's verdict of guilty on the offense of manslaughter in the first degree was necessarily a rejection of the defense of self-defense. Since the elements of self-defense as applied to manslaughter in the second degree would have been the same as those applied to manslaughter in the first degree, the defendant would not have benefited by an instruction that the defense was applicable to manslaughter in the second degree." Id., 589.

[15] The defendant cites *State* v. *Singleton*, 292 Conn. 734, 763, 974 A.2d 679 (2009), for the proposition that he could not be the initial aggressor by his act of hitting Medina. In *Singleton*, our Supreme Court concluded that "the trial court's instructions that '[t]he initial aggressor is the person who first acts in such a manner that creates a reasonable belief in another person's mind that physical force is about to be used upon that other person' and that '[t]he first person to use physical force is not necessarily the initial aggressor' were entirely consistent with the law and thus were proper." Id. Our Supreme Court's holding in *Singleton* did not restrict the prosecutor in the present case from arguing that the defendant was the initial aggressor.

[16] The court instructed the jury with respect to initial aggressor as follows: "Another circumstance in which a person is not justified in using any degree of physical force in . . . self-defense against another is when he is the initial aggressor in the encounter with the other person and does not both withdraw from the encounter and effectively communicate his intent to do so, before using the physical force at issue in this case."

[17] The following colloquy occurred between Mendez and the prosecutor:

"[Mendez]: . . . Um, so we, like, everybody was, like, trying to separate the fight and then, I guess, that's when [Tucker], like, he was preparing himself to fight, because he was going to defend [Medina]. And at that moment, I saw a quick movement, between [Tucker] and [the defendant], I wasn't too sure and then [Tucker] told me that he got stabbed. . . .

"[The Prosecutor]: Okay. How far away were you from [Tucker] when that happened?

"[Mendez]: Maybe, like, two feet away.

"[The Prosecutor]: And, did you indicate that in all of your statements, that you saw that?

"[Mendez]: Yes, sir."

[18] The following colloquy occurred between Adames and defense counsel:

"[Defense Counsel]: Okay. But you didn't actually see [Tucker] get stabbed, did you?

"[Adames]: No, I didn't see him get stabbed."

[19] Contrary to Fernandez' testimony, the defendant's father, Eliezer Ruiz, Sr., testified that his son, Eliezer, had a nickname of Junito.

[20] Absent this final claim of the prosecutor's improper reference to facts not in evidence, namely, the fact that the police officers did not believe this was a self-defense situation, all of the prosecutor's comments were proper. The due process analysis need not consider the comments which we have already determined were proper. See *State* v. *Luster*, 279 Conn. 414, 442, 902 A.2d 636 (2006).

[21] The court issued the following cautionary instruction: "Before I start, however, you heard the final arguments of counsel, and I had advised you earlier on that that's not evidence and that insofar as any inferences counsel requests you to draw, they must be based on the evidence that you've heard. . . . So, for example, [the prosecutor] indicated [his] opinion that he could argue to you that the police officers didn't believe this was a self-defense issue. There was no evidence as to what the officers believed, as far as that particular issue is concerned. It may be that if you were to hear the whole of the evidence, you could draw the inference, but it is not for counsel to draw that for you.

"So, with that having been said, please, understand the limitations on final argument; it's not evidence, it should not include the opinions of the attorneys, and it should . . . only be based on evidence, and you are the finders of fact and the only finders of fact, in this case."